[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 31, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-11527

_____

D.C. Docket No. 83-01676-CV-M-S


JOHN F. KNIGHT, JR., et al.,

Intervenor-Plaintiffs-
Appellants,


versus


ALABAMA, STATE OF,
ALABAMA A & M UNIVERSITY (AAMU),
ALABAMA STATE BOARD OF EDUCATION,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(January 31, 2007)**

Before EDMONDSON, Chief Judge, HILL and KRAVITCH, Circuit Judges.

HILL, Circuit Judge:

Plaintiffs claim that certain tax provisions of the Alabama Constitution violate the United States Constitution. They assert that these tax provisions so seriously underfund public education in Alabama that they have a segregative effect on Alabama's colleges and universities. The district court denied the claim, and this appeal followed.

I.

This case was filed in 1981, claiming that the State of Alabama had failed to complete the desegregation of its colleges and universities.[1] Plaintiffs alleged that many of Alabama's polices governing higher education tended to perpetuate its formerly *de jure* segregated university system. The challenged education policies included: admissions standards at historically white institutions, claimed to disqualify disproportionate numbers of black applicants; selection procedures for the governing boards, administrations and faculty of historically white institutions, claimed to result in the under representation of blacks; curriculum policies at

---

[1]The United States Department of Education informed Governor Fob James and the various university presidents that there were vestiges of a prior *de jure* segregated system of higher education in Alabama. After several months of unsuccessful negotiations, the Justice Department filed this suit. Defendants included the State, the Commission on Higher Education, the State Public School and College Authority, and ten historically white educational institutions. A class of private plaintiffs, represented by John F. Knight, and other named plaintiffs who had previously filed a separate suit, was permitted to intervene.

historically white institutions, claimed to include little representation of black history, thought, or culture; campus environments at historically white institutions, claimed to be hostile to blacks; funding and facility policies governing historically black institutions, claimed to result in their inadequacy; duplication of programs at both historically white and historically black institutions, claimed to result in racial separation; and restrictive institutional missions at historically black institutions, claimed to result in the absence of graduate and other desirable programs at those institutions.[2]  Plaintiffs sought change in these policies that would tend to decrease the *de facto* segregation, or racial identifiability, of Alabama's colleges and universities.

In 1991, following two bench trials that lasted over seven months, during which the court heard approximately 200 witnesses and received hundreds of thousands of pages of exhibits, the district court issued a 360-page opinion in which it found liability.  *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991) (*"Knight I"*).  The court found that several of Alabama's higher education policies, including those governing faculty and administrative employment, allocation of funds and facilities at historically black institutions, admissions at

---

[2]For a detailed summary of plaintiffs' contentions and those of the other parties, see *Knight v. Alabama*, 787 F. Supp. 1030, 1051-61 (N.D. Ala. 1991) ("*Knight I*").

historically white institutions, and program duplication did tend to result in the racial identifiability of its colleges and universities. *Id.* at 1368. The court ordered the parties to develop and the State to implement specific modifications to these policies in order to increase black access to historically white institutions and encourage white attendance at historically black institutions. *Id.* at 1377-82.

Just six months after the district court entered its judgment in *Knight I*, the Supreme Court decided *United States v. Fordice*, 505 U.S. 717 (1992), the first case in which the Court enunciated the constitutional standards governing claims of persistent segregation in higher education. In *Fordice*, the court made clear that even race-neutral "policies now governing the State's university system" may violate the Fourteenth Amendment. 505 U.S. at 733. In order to successfully challenge such policies, the Court said, plaintiffs must demonstrate that they are traceable to the State's prior *de jure* system of segregation in higher education. *Id.* Having done so, the burden shifts to the State to prove that these policies do not have a continuing segregative effect. *Id.* at 738-39.[3] Failure of the State to do so authorizes the court to find liability and issue remedial orders. *Id.*

A few months later, *Knight I* reached us on appeal, and we reviewed the

---

[3]If the State is unable to show that the challenged policy has no continuing segregative effects, the State may nevertheless escape liability if "the State show[s] that there are no less segregative alternatives which are practicable and educationally sound." *Id.* at 743.

4

district court's judgment under the newly-established *Fordice* standards. We were impressed with the extent to which the district court had anticipated those standards, and we acknowledged this prescience, affirming most of the judgment and remanding only for a limited review of a few discrete elements of it. *Knight v. Alabama*, 14 F.3d 1534, 1540 (11th Cir. 1994).

On remand, and prior to any proceedings, the district court took the extraordinary step of appointing five neutral expert witnesses to assist it in fashioning a constructive remedial decree.[4] These experts reviewed the policies found to perpetuate segregation in Alabama's colleges and universities and recommended changes to reduce racial separation in the system.

Then, in 1995, the court entered its remedial decree. The court ordered numerous changes in Alabama's higher education policies, including less duplication of programs at geographically close institutions; strengthened

---

[4]This very prestigious committee was composed of Dr. Robert M. Anderson, Jr., Vice Provost for Extension and Director of Cooperative Extension at Iowa State University; Lt. Gen. Julius W. Becton, Jr., former President of Prairie View A & M University and board member for various organizations committed to equal access to higher education and former member of various presidential administrations; Dr. Harold L. Enarson, President Emeritus of The Ohio State University, Executive Director of the Western Interstate Commission for Higher Education and member of President Truman's White House Staff; Dr. Robben Fleming, President Emeritus of the University of Michigan at Ann arbor, former President of the Corporation of Public Broadcasting; Chairman of the American Association of Universities and a Fellow of the American Academy of Arts and Sciences; and Dr. Bryce Jordan, President Emeritus of the Pennsylvania State University and founding president of the University of Texas at Dallas.

curricula at historically black institutions; increased integration of administration and faculty at all institutions; more flexible admissions policies; increased black student recruitment; and increased funding of historically black institutions. *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995) ("*Knight II*").

Additionally, the court appointed a Monitor and an Oversight Committee,[5] charged with the administration of its remedial decree. The court also conducted periodic reviews of the State's compliance with its orders. Finally, the district court retained jurisdiction to monitor the State's progress in implementing these changes.

Over the succeeding decade, under the supervision of the court, the parties worked tirelessly to develop and implement new programs, change old ones, and in many other ways to effectuate the changes called for in the court's remedial decree. The district court has noted on numerous occasions, as it did in ruling on the instant motion, that "the State has unbegrudgingly complied with the Court's remedial decrees, meeting all its obligations as ordered by the Court." *Knight v. Alabama*, 458 F. Supp. 2d 1273, 1312 (N.D. Ala. 2004) ("*Knight III*"). The court and the parties anticipated that, after ten years of constructive remediation of

---

[5]The Oversight Committee is composed of four of the five previously appointed neutral expert witnesses.

6

Alabama's system of higher education, the court would return control of that system to Alabama in the summer of 2005. *Knight I*, 900 F. Supp. at 374.

This lawsuit, then, for over fifteen years, has been about remedying *segregation* in Alabama's system of *higher* education by making changes in the education policies that tended to keep Alabama's historically black colleges black, and its historically white colleges white. While the court has ordered many changes that required the State to dramatically increase its funding of higher education – especially at its historically black institutions – the State has always "unbegrudgingly" raised and spent this money. This lawsuit, however, has never been about *how* Alabama raised the money to meet its court-ordered obligations to *higher* education, much less about how Alabama funds its system of *lower* ("K-12") education.

Nonetheless, in July of 2003, plaintiffs filed the pleading we now review. Although styled "Motion for Additional Relief," nowhere in the motion is there any request for additional relief regarding Alabama's *higher education* system. There is no request whatsoever for additional funding or any other changes in the education policies governing higher education in Alabama.

Instead, plaintiffs request an injunction ordering Alabama to fund adequately its system of *lower* education, and to do so by developing an entirely

7

new method of public school finance in the state. Plaintiffs contend that only the complete reformation of Alabama's school finance system for *lower* education – including the invalidation of certain provisions of the Alabama Constitution[6] that limit both the rates and actual revenues from property taxation – will allow the State to raise the revenue necessary to adequately fund its K-12 schools. And, only when Alabama's public schools are adequately funded, according to plaintiffs, will there be sufficient other funds to achieve the remedial goals of this lawsuit. Therefore, plaintiffs asked the district court to invalidate the property tax limitations of the Alabama Constitution and to enjoin the State to reform its method of public school finance within one year to provide adequate and equitable funding for its K-12 schools.

Although moved by defendants not to allow a new theory of liability ten years after the entry of the court's remedial decree, the district court held a two-day evidentiary hearing on the claim in May of 2004.[7] The court heard from many

---

[6]Various constitutional provisions limit the rate of property taxation by the state and its counties, impose significant assessment limitations on certain classes of property for taxation purposes, and provide substantial exemptions from taxation. Finally, Amendment 373, passed in 1973, known as the "Lid Bill," limits tax collections in any one year on any particular property to a certain percentage of its fair market value. Plaintiffs assert that they are entitled to a declaration that these property tax provisions violate the Thirteenth, Fourteenth, and Fifteenth Amendments to the United States Constitution, the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, and Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d.

[7]The State did not appeal the denial of its motion to disallow plaintiffs' new claim.

experts on both the historical context and the school funding implications of Alabama's methods of public school finance.

The following October, the district court entered a ninety-page opinion and order denying the "Motion for Additional Relief." *Knight III*, 458 F. Supp. 2d at 1314. The district court held that, as a claim for liability, plaintiffs had failed to establish that the alleged funding crisis in Alabama's *K-12* education system had a segregative effect on its system of *higher* education. *Id.* at 1312-13. Furthermore, the court held plaintiffs had failed to establish a need for any additional relief, as the State had already complied, or was complying, with all the court's previously-entered remedial orders, as agreed upon by all the parties. *Id.* The district court concluded that, while it "appreciate[d] Plaintiffs' argument" that "the current property tax system in Alabama has a crippling effect on the ability of local and state government to raise revenue adequately to fund K-12 schools," it disagreed with plaintiffs' assertion that this lower school *funding* problem was sufficiently related to the *desegregation* of the State's higher education system to permit a remedy in this lawsuit. 458 F. Supp. 2d at 1312.

We agree with the district court that plaintiffs' present claim is fundamentally about reforming Alabama's K-12 school funding system, and not about desegregating its colleges and universities. Plaintiffs themselves made this

clear when they filed the claim. On the first page of their supporting memorandum, plaintiffs called the district court's attention to Alabama Supreme Court's dismissal of the public school funding litigation in the Montgomery County Circuit Court, known as the *Equity Funding Cases*. *See Ex Parte James*, 836 So. 2d 813, 816 (Ala. 2002). Plaintiffs asserted that the dismissal of these state cases entitled them to "raise claims regarding Alabama's school funding system in this [federal] action.[8] Plaintiffs' requested relief was that the district court enter an injunction requiring the State to revise its tax policies and tax rates to *adequately fund K-12 education*.

Plaintiffs present claim, then, is not a claim for *desegregation* in Alabama's system of higher education. It is a school finance claim. Because we find this distinction fatal to plaintiffs' claim, we pause to explain the difference.

II.

Section 256 of the 1901 Alabama Constitution requires "a liberal system of public schools throughout the state for the benefit of the children." In 1956, as the State's direct, indeed avowed, response to *Brown v. Board of Education*, Section 256 was amended to provide that "nothing in this Constitution shall be construed

---

[8]Much of this history is chronicled in the district court opinion. *See Knight III*, 458 F. Supp. 2d at 1279-1311.

10

as creating or recognizing any right to education or training at public expense." Ala. Const., art. XIV, § 256, Amend. 111 (1901). Thereby, Alabama served notice that its support for integrated public education was conditional. Subsequently, other amendments were added to the state constitution that imposed strict limits on the ability of state and local governments to raise revenue from property taxes – the traditional method of funding K-12 education in Alabama.[9]

In 1990, the Alabama Coalition for Equity, Inc. (the "Coalition"), acting on behalf of schoolchildren, parents and school systems throughout the State of Alabama, brought a lawsuit in circuit court in Montgomery County, Alabama, seeking a declaration that Amendment 111 was unconstitutional because its avowed purpose was racial discrimination. The Coalition also sought a declaration that state funding of K-12 education did not provide an adequate or equal education for all of Alabama's school children. *Alabama Coalition for Equity, Inc. v. Hunt*, No. CV-90-883 (Ala. Cir. Ct. Apr. 1, 1993). This case was consolidated with a similar lawsuit filed in the same court in 1991, *Harper v. Hunt*, No. CV-91-0117 (Ala. Cir. Ct. Jan. 19, 1991) and together they became known as the *Equity Funding Cases*, reprinted in *Opinion of the Justices No. 338*, 624 So. 2d 107, 110-67 (Ala. 1993).

---

[9]See note 5, *supra*.

In April of 1993, the *Equity Funding Cases* state court held that Amendment 111's racially discriminatory purpose violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 111-12. The court declared that Amendment 111 of Section 256 was void in its entirety. *Id.* The court also declared that the original language of Section 256, guaranteeing Alabama's school children an "adequate education," remained Alabama law. *Id.* The court further held that, although Alabama's schoolchildren were guaranteed an adequate education, Alabama's funding of its public school system did not provide it. *Id.* The court enjoined state officers to "establish, organize and maintain a system of public schools, that provides equitable and adequate educational opportunities to all school-age children." *Id.* at 166.

This judgment was not appealed, in part because the circuit court retained jurisdiction over the case to address other matters,[10] but the legislature immediately passed a resolution requesting the Alabama Supreme Court to render an advisory opinion on whether the circuit court's judgment was binding in view

---

[10]Additionally, the parties were never really in an adversarial position. *See Ex Parte James*, 836 So. 2d at 816 (noting that "members of this Court have expressed serious concerns regarding the underlying foundations of this case," and citing Hooper, C.J., dissenting from the *James* majority, describing the proceedings as a "sham" due to a lack of true adversity between the parties").

of the separation of powers principle of the Alabama Constitution.[11] On April 27, 1993, barely four weeks after the circuit court's judgment, the Supreme Court advised the legislature that the state court's order must be enforced. *Id.* at 110.

Over the course of the next decade, remedial plans were proposed but none was implemented. Although there was much ado, it turned out to be about nothing much. Consequently, in 2001, the *Equity Funding Cases* plaintiffs moved the Montgomery County circuit court to take some action to enforce its injunction. Shortly thereafter, the State proposed a new remedial plan containing an estimated annual increase in expenditures for K-12 education of $1.7 billion.

One year later, in 2002, the Alabama Supreme Court dismissed the *Equity Funding Cases*, holding that the circuit court's order did, after all, violate the Alabama Constitution's principle of separation of powers. *Ex Parte James*, 836 So. 2d at 816. The court held that "because the duty to fund Alabama's public schools is a duty that – for over 125 years – the people of this State have rested squarely upon the shoulders of the Legislature, it is the Legislature, not the courts, from which any further redress should be sought."[12] *Id.*

---

[11]The Alabama Advisory Opinion Act authorizes the Justices of the Supreme Court to render advisory opinions to the legislature. Ala. Code § 12-2-10.

[12]The court relied upon Section 43 of the Alabama Constitution, which provides that the court "shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men." 836 So. 2d at 819. The court reasoned that

Within a year of the Alabama Supreme Court's dismissal of the *Equity Funding Cases*, plaintiffs in this case filed their "Motion for Additional Relief."[13] Although styled as a motion for additional *relief*, plaintiffs really sought an adjudication of a new *claim*. For the first time in *this* lawsuit, plaintiffs claimed that segregation in Alabama's system of higher education is caused by Alabama's constitutional limitations on its ability to raise property taxes for K-12 education.

Although the connection between underfunding of Alabama's public *schools* and segregation in its *universities* is far from intuitive, plaintiffs constructed an elaborate "chain of causation" said to link the two. According to plaintiffs, Alabama's property tax limitations result in underfunded public schools. This, in turn, results in the diversion of state funds intended for higher education to lower education. This diversion of state funds to K-12 education, results in Alabama's inability to adequately fund its system of higher education. This, in turn, results in higher tuition at Alabama's colleges and universities. At the same

---

"[t]he pronouncement of a specific remedy 'from the bench' would necessarily represent an exercise of [legislative] power," and "such judicial intrusion would represent a jurisprudential divergence with other state courts who . . . have refused to become involved with school-funding matters." *Id.* at 818, 817. The court held that the imposition of a specific remedy for the violation of any constitutional right to education was beyond its judicial capacity. *Id.* at 819.

[13]Plaintiffs seek an injunction requiring the legislature adequately to fund its K-12 schools. This was the exact relief sought, ordered, but never obtained in the *Equity Funding Cases*.

time, plaintiffs contend, there is less state money for college scholarships. All of this impacts negatively and disproportionately on Alabama's black students, plaintiffs assert, because most cannot attend college without financial assistance.

Plaintiffs argue, therefore, that their new claim against Alabama's property tax policies is properly brought in this lawsuit because those policies produce a "continuing segregative effect" on its colleges and universities, as proscribed by *Fordice*. We disagree.

III.

1.  Alabama's Tax Policies Are Not Policies "Governing Higher Education"

Plaintiffs allege that Alabama's tax policies seriously limit the ability of both the State and its counties to raise revenue from property taxes and, therefore, fund its K-12 schools. No one disputes that this is so. Plaintiffs also allege that these constitutionally enshrined tax policies were adopted for segregative purposes and with discriminatory intent. The district court has so held. The trouble is that neither of these contentions advance the plaintiffs' claim – asserted in its motion for additional relief – that these tax policies may be challenged under *Fordice* as policies that perpetuate segregation in Alabama's system of higher education. They may not.

Under *Fordice*, "policies now *governing the State's university system*" may

15

violate the Fourteenth Amendment if they are "traceable to its prior de jure dual system" and "continue to have segregative effects." 505 U.S. at 733 (emphasis added). The segregative policies proscribed by *Fordice* govern *higher education,* not *revenue raising*. The property tax policies plaintiffs now challenge, however, are revenue policies; they are *not* policies that "govern higher education" as contemplated by *Fordice*. The challenged tax policies have nothing to do with admissions, faculty and administration, availability of degree programs, student recruitment, education facilities or any other aspects of higher education that *Fordice* recognized may discourage black students from attending historically white institutions and white students from attending historically black institutions. They are not, therefore, the sort of *education* policies that *Fordice* recognized could perpetuate racial identifiability in higher education. We conclude, therefore, that plaintiffs' present claim is not properly brought under *Fordice*. The district court knew that there was something wrong with this approach, but employed it anyway. *See* 458 F. Supp. 2d at 1313 n. 9 ("The Court expresses doubt that the matter before the Court even triggers *Fordice*"). We decline to do so.

Furthermore, even if Alabama's property tax policies were properly attacked under *Fordice*, we would agree with the district court that any segregative effect they may have on its system of higher education is far too attenuated to entitle

16

plaintiffs to the relief they request. Plaintiffs' chain of causation contains the following links: constitutional limits on property taxation result in underfunded K-12 schools, which causes the State to divert state funds intended for higher education to lower education, which results in higher tuition at Alabama's colleges and universities as well as fewer funds for student aid and, therefore, lower black attendance. The district court concluded that there are simply far too many links in this chain to permit us to infer that Alabama's method of funding its K-12 education causes, in any meaningful way, the continuing segregation of its colleges and universities. We agree.

Additionally, we note that plaintiffs' chain of causation silently incorporates too many unsupported assumptions. First, plaintiffs assume that the abolition of Alabama's constitutional limitations on property taxation will result in increased tax revenues. Second, plaintiffs assume that legislative decisions regarding the allocation of these putative increased revenues will result in increased funding of higher education. Even a cursory examination reveals that neither of these assumptions is unproblematic.

It is not at all clear that the removal of Alabama's constitutional restrictions on property tax rates will necessarily result in either *increased tax rates or increased tax revenues*. In 2003, for example, proposed changes in Alabama's tax

17

structure, including state and local property taxes, were overwhelmingly rejected by Alabama voters. Even in the absence of constitutional limitations, there is nothing in plaintiffs' request for relief that would inhibit the ability of the people of Alabama to refuse to raise property tax rates.

Similarly, there is no way to know how the elimination of constitutional limitations on property taxes will affect the willingness of industrial or other commercial activity to locate or remain in the state. The possibility of business flight, thereby decreasing tax revenues of all kinds, is not addressed by plaintiffs' chain of causation.

Furthermore, plaintiffs' demand for the removal of the constitutional property tax restrictions assumes not only that tax revenues will necessarily increase, but that these revenues would automatically go to Alabama's underfunded K-12 schools. But such *revenue allocation* decisions are the province of the Alabama state and local governments. Even if Alabama's property tax revenues were to increase, thereby potentially increasing funds for both K-12 and higher education, there is no way to know what the Alabama legislative response would be. Although Alabama presently spends a higher percentage of its total budget on public education than any other state in the union, and ranks higher

in per capita spending for education than for overall government spending,[14] there is no way to predict whether these levels of appropriations would continue if Alabama's property tax revenues were to increase.

Many other public programs compete with education for the Alabama tax dollar. Highway construction and maintenance, public safety programs, public health undertakings, and a host of other programs compete for Alabama's tax dollar. Presently, virtually 100% of the state income tax is appropriated to K-12 education (teacher salaries). Most of the state's sales tax revenues also go to general education purposes. If property tax revenues were to rise, it is impossible to say whether the State would continue to allocate the sales and income taxes to education or transfer these revenues to other programs.

Neither is there any way to know whether tuition would decline or student financial assistance would increase. These appropriation decisions would remain totally unaffected by any order of this court affecting Alabama's property tax limitations, assuming, of course, that we do not also assume the "fundamental and

---

[14]We do not overlook the fact that Alabama's total tax revenues rank it 46th among the states or that its per capita state and local government expenditures for K-12 education rank it 39th. These expenditures reflect legislative choices on the allocation of resources that are beyond the reach of this court.

19

delicate power of taxation" in the State of Alabama.[15] *Missouri v. Jenkins*, 495

U.S. 33, 51 (1990).

We conclude that even if underfunding of Alabama's K-12 schools were

related to segregation in its colleges and universities, this relationship is too

attenuated and rests on too many unpredictable premises to entitle plaintiffs to

relief under *Fordice*.

At root, the problem with plaintiffs' new claim is that it is not a claim for

desegregation, but is rather an attack on Alabama's method of public school

funding.[16] Plaintiffs' claim is typical of those made in a proliferation of school

finance litigation over the last thirty years.[17] Such litigation often attacks the

county-based property tax method of funding K-12 education, seeking to increase

---

[15]In *Missouri v. Jenkins*, the Supreme Court expressly rejected a district court's attempt to remedy school underfunding through the judicial increase of tax rates. 495 U.S. 33 (1990). The Court agreed that the district court exceeded its authority in ordering raised the property tax rate of the Kansas City, Missouri School District. *Id.* at 51.

[16]Alabama argues that it must be remembered that its relatively low property taxes are part of an overall tax structure that relies as well on an income tax and a sales tax. Other states, it reminds us, depend more heavily on property taxes because they have no income tax (Florida and Washington) or no sales tax (Oregon and New Hampshire). Furthermore, even under the Lid Bill, local taxing authorities may raise the rate of any tax through local initiative and public hearing, a local act of the legislature, or local referendum, so long as the constitutional maximums are not exceeded. According to plaintiffs, this method of raising taxes has been utilized extensively since 1978. New amendments to the constitution also permit local constitutional amendments raising property tax rates through local referenda, which allow the Lid Bill property tax limitations to be avoided completely.

[17]*See generally*, James E. Ryan, *School, Race, and Money*, 109 YALE L. J. 249 (1999).

the amount raised, and to equalize the amount available to each county in order to improve the academic opportunities and performance of students disadvantaged by existing finance schemes.  Aimed as it is at increased and equalized funding, it targets not only minority students, but all "poor" students.  Thus, school finance litigation is not aimed at *desegregation* under the United States Constitution, but rather at equalization of resources in order to provide an adequate education required not by the federal, but by *state* constitutions.[18]

The problem for plaintiffs is that this lawsuit *is* about desegregation. Plaintiffs, themselves, filed a claim alleging continued *segregation* in Alabama's colleges and universities.  By asserting this claim, they set the agenda of the lawsuit, challenging Alabama's policies that govern higher education.  *Fordice*, 505 U.S. at 733.   Alabama's property taxes are not such policies.

Plaintiffs' new claim, if successful, might obtain a remedy for the

---

[18]The Supreme Court rebuffed such efforts in the federal courts, holding that there is no federal constitutional right to education and upholding an unequal school finance scheme under rational review. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 58-59 (1973).  After *Rodriguez*, it has been noted that "[w]hether intentionally or not, at least some federal courts have used school desegregation decrees to circumvent the limitations imposed by *Rodriguez* or similar state-court decisions rejecting school finance challenges."  Ryan, 109 Yale L. J. at 264. Others have noted that school districts that once intentionally segregated students "have become plaintiffs in school desegregation cases, seeking *Milliken II* relief against the state in an attempt to circumvent the limitations imposed by *Rodriguez*." Theodore M. Shaw, *Missouri v. Jenkins*: Are We Really a Desegregated Society?, 61 Fordham L. Rev. 57, 60 (1992). Similarly, plaintiffs in this desegregation lawsuit are seeking school *finance* reform.

underfunding of Alabama's public schools already established in the *Equity Funding Cases*. While we, like the district court, are not entirely unsympathetic to plaintiffs' attempt to bring Alabama's K-12 funding problems, identified but never remedied in the *Equity Funding Cases*, within the reach of the mandatory injunction already in place in this case, we agree with the district court that such a remedy is not available in this lawsuit. After fifteen years of litigation aimed at changing Alabama's education policies that perpetuate segregation in its colleges and universities, plaintiffs are attempting to transform their *Fordice* attack on Alabama's segregative education policies into an attack on the adequacy and fairness of Alabama's entire public school finance system. This claim is not properly before us.[19]

---

[19]Plaintiffs appear to argue in their brief that the legal basis for their present claim (including, apparently, any requirement for causation) is irrelevant. They assert that it is Alabama's duty to eradicate "all the continuing barriers to black students' equal access to higher education, *regardless of how attenuated may be their causal connections to the property tax system* in the court's view." (emphasis added) In plaintiffs' view, it is enough that "[h]igher education is where all the underfunded chickens in Alabama's K-Ph.D. system of public education come home to roost." Plaintiffs urge this court to provide them the remedy denied in the state courts because "[t]here is no statewide K-12 school desegregation case; only in the instant action can the full ramifications of the historical discrimination . . . be confronted and remedied."

This request for a remedy untethered to a constitutional violation, though sincere, misunderstands the nature of the judicial power. The courts are not empowered generally to "make things right." The district court's jurisdiction was invoked by plaintiffs to recognize and remedy the constitutional wrongs alleged to exist in Alabama's system of higher education.

Plaintiffs' property tax claim is aimed at Alabama's school finance policies. Although brought under *Fordice*, this claim has almost nothing to do with higher education policies. Furthermore, plaintiffs' belated attempt to add an argument against the tax policies under *Hunter*

2. Even Under *Fordice*, the Constitutional Property Tax Provisions  Do Not Have a Continuing Segregative Effect on Higher Education in Alabama.

Even if we were to overlook the inapplicability of *Fordice*, and examine plaintiff's claim under that standard, we would agree with the district court that Alabama has met its burden to demonstrate that its property tax policies do not

*v. Underwood*, 471 U.S. 222 (1985) (raised for the first time on motion for reconsideration of the denial of their present claim) and *Hunter v. Erickson*, 393 U.S. 385 (1969)– cases having absolutely nothing whatsoever to do with higher education – reinforce our conclusion that the present claim does not arise under *Fordice*.

To the extent that plaintiffs'attack on Alabama's tax policies is predicated upon allegations of underfunding that denies Alabama's schoolchildren an adequate education, it does not state a federal constitutional claim. *Rodriguez*, 411 U.S. at 58-59.  To the extent that plaintiffs' claim is that Alabama's tax policies evidence a discriminatory intent to deprive Alabama's K-12 children of equal protection of the law, under *Underwood* and *Erickson*, it does not state a claim for desegregation of higher education under *Fordice*.

Such distinctions are not mere legal technicalities.  Simply put, it is plaintiffs' position that the district court in this case had not only the authority but the obligation to remedy any and all constitutional violations brought to its attention in this lawsuit ( plaintiffs assert that "a federal court does not have the discretion to ignore patent constitutional violations solely because they expand the subject matter of the original complaint").  Plaintiffs believe that the district court should have enjoined enforcement of the offending tax provisions whether or not they affect higher education "in light of the findings of continuing adverse racial impact in *other areas of public education and civil society*."  We are asked to correct the "clear equal protection violations" alleged in Alabama's tax policies notwithstanding the fact that, as plaintiffs concede, they have "limited their demands for relief to desegregation of higher education."  We are empowered, plaintiffs assert, by Rule 54(c) of the Federal Rules of Civil Procedure to "grant the relief to which the party . . . is entitled, even if the party has not demanded such relief in his pleadings."

We must decline such a request to expand our authority beyond this "case or controversy" to the general "doing of justice" that plaintiffs appear to believe to be our statutory mandate. Despite what plaintiffs think, Rule 54(c) does not empower us generally to provide a remedy for all wrongs.  Plaintiffs' challenge of Alabama's tax policies at this late date in this higher education litigation raises issues involving the Eleventh Amendment, the Tax Injunction Act, the availability of a state remedy and a host of other issues – none briefed, argued, or considered by the district court.   We must resist this attempt and the invitation to abandon long-standing principles of judicial restraint.

23

have a continuing segregative effect on its system of higher education. Plaintiffs assert that higher education in Alabama is so underfunded that black students are denied an equal opportunity to attend college. The record evidence is to the contrary.

Under *Knight I*, the State has demonstrated its willingness and ability to raise funds for higher education irrespective of its K-12 funding policies.[20] From 1990 to 2004, Alabama's appropriations for higher education increased from $820,063,882 to $1,160,033,885 annually. Over $179 million in new funds had been appropriated to Alabama's historically black universities as of 2003.[21] Alabama has clearly demonstrated an ability to raise funds for its colleges and universities despite its K-12 funding limitations.

Furthermore, as a result of changes in the policies that govern higher education in Alabama – agreed to by the parties and implemented by the State –

---

[20]To the extent that plaintiffs argue that their funding claim is appropriate in this case because Alabama does not have enough money to effect the desegregation remedies previously ordered, the district court rejected this contention and so do we. Plaintiffs point to no specific instance where the State has failed in its remedial obligations. On the contrary, the district court noted that the State has met all of its obligations under previous orders and done so "unbegrudgingly." Based upon the record, we agree.

[21]Although unrelated to the ability of black students to attend college, it should be noted that the State has complied with the district court's order to improve the curricula of its historically black colleges, adding programs in mechanical and electrical engineering, masters programs in accounting, health information management programs, occupational therapy programs physical therapy and a doctorate program in educational leadership.

24

there has been enormous improvement in black students' access to higher education in Alabama.  During this period, total undergraduate or graduate degrees awarded to black students increased 96.43%, while white students' graduation rates actually dropped 13.36%.

Part of the credit for such improvement in black completion rates must be given to the many new financial aid programs benefitting black students that the State has instituted.  Numerous minority and diversity scholarships have been added at both of Alabama's historically black universities.  The State also created the Alabama State University Trust for Educational Excellence and the Alabama A & M University Trust for Educational Excellence – both of which have, as their first dedicated use, the funding of diversity scholarships.  *See Knight II*, 900 F. Supp. at 349-56.

The district court has unflaggingly monitored Alabama's progress in completing the desegregation of its system of higher education over the last ten years, and it has pronounced itself satisfied that the State has met its *Fordice* burden (if any) to demonstrate that the challenged tax policies do not produce a segregative effect on Alabama's system of higher education.  To be sure, Alabama's colleges and universities remain a work in desegregative process.  But, over the last ten years,  the State has worked diligently with the plaintiffs to

develop and implement modifications in the policies that govern Alabama's system of higher education. These changes have ameliorated the segregative effects of underfunding – from *whatever* source – and underuse – for *whatever* reason – of Alabama's black colleges and universities, and brought meaningful desegregation to the State's system of higher education, as the district court envisioned and ordered. We agree with that court that the challenged tax policies have not undermined that desegregative process to a level that even remotely triggers the United States Constitution.

## IV.

We cannot permit federal lawsuits to be transformed into amorphous vehicles for the rectification of all alleged wrongs, no matter how belatedly asserted, nor how unrelated to the underlying action.[22]

As the district court said in its 1995 remedial decree:

---

[22]Although our decision today may be seen to leave plaintiffs without a remedy for the wrong identified in the *Equity Funding Cases*, the Supreme Court suggested in *Rodriguez* that:

> The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States. . . . the need is apparent for reform in tax systems which may well have relied too long and too heavily on the local property tax. . . . but the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

411 U.S. at 58-59.

This Court does not intend this Remedial Decree to solve all of Alabama's education woes or racial tensions. Alabama has much of both that are beyond the scope of the court's remedial authority. The court does intend the Decree to eliminate segregative effects remaining within Alabama's system of higher education, as far as practicable and educationally sound.

Because the district court correctly rejected plaintiffs' newly raised claim that Alabama's tax policies have a continuing segregative effect on its system of higher education, we hold that the judgment of the district court is

AFFIRMED.