[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 5, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12076

_____

D.C. Docket No. 05-80765-CV-KLR

YOUNG APARTMENTS, INC.,

Plaintiffs-Appellants,

versus

TOWN OF JUPITER, FL,
ANDREW LUKASIK,
ROBERT LECKY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 5, 2008)**

Before ANDERSON and BARKETT, Circuit Judges, and TRAGER,* District Judge.

TRAGER, District Judge:

Plaintiffs-appellants Young Apartments, Inc. ("Young Apartments") appeals a district court order dismissing several of its equal protection claims found under 42 U.S.C. § 1983 ("§ 1983") against defendants-appellees Town of Jupiter, Florida ("Jupiter"), Jupiter Town Manager Andrew D. Lukasik ("Lukasik") and Jupiter Building Official Robert Lecky ("Lecky"), as well as a breach of contract claim against Jupiter. Young Apartments claims that Jupiter, through the actions of town officials including Lukasik and Lecky, is attempting to drive away the Town's growing population of Hispanic immigrant residents by targeting the landlords (including Young Apartments) who provide these residents with affordable housing. Young Apartments claims that it has suffered significant financial injury as a result of Jupiter's discriminatory attempts to eliminate the affordable housing available to Hispanic immigrants. Young Apartments also asserts that Jupiter's condemnation of some of Young Apartments' housing units breached the express terms of an agreement negotiated between the parties.

In a ruling on defendants' motion to dismiss, the district court found that

---

* Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

(1) Young Apartments lacked standing to bring a race-based equal protection claim, so that it could only review the housing ordinance under a rational basis standard and Young Apartments could only proceed with its selective enforcement claim under a "class of one" analysis;[1] (2) the complaint failed to state a cause of action against Lukasik and Lecky in their individual capacities; and (3) Young Apartments could not state a cause of action for breach of contract because a municipality cannot bargain away its police power.

After careful review, we reverse the district court's determination that Young Apartments lacked standing to bring an equal protection claim alleging discrimination against its Hispanic tenants. We further reverse with respect to the district court's determination that Young Apartments only sued Lukasik and Lecky in their official capacities. Finally, we affirm the district court's dismissal of Young Apartments' breach of contract claim.

---

[1] A "class of one" equal protection claim does not allege discrimination against a protected class, but alleges that the plaintiff "'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Griffin Indus. v. Irvin, 496 F.3d 1189, 1202 (11th Cir. 2007) (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).

# BACKGROUND

## (1)

## Factual History

Because this case comes to us as an appeal from a motion to dismiss, the facts alleged in the complaint must be accepted and construed in the light most favorable to the plaintiff. Beck v. Deloitte & Touche, 144 F.3d 732, 735 (11th Cir. 1998). Accordingly, the following statement of facts is drawn from Young Apartments' first amended complaint.

Young Apartments is the owner of an apartment complex in Jupiter, Florida. The apartment complex is made up of two buildings which have a total of thirty rental housing units. Young Apartments purchased the property in March 2000 for $1.145 million. At the time, the property was in full compliance with the Housing Standards Code of Jupiter and the complex was nearly one-hundred percent rented and occupied. The property was part of an area of Jupiter known as "Center Street," with approximately one hundred rental units similar to the ones owned by Young Apartments.

At the time that Young Apartments purchased the property, Jupiter's Hispanic population was increasing, primarily as a result of an influx of immigrant workers seeking jobs in the construction and labor-intensive sectors of Jupiter.

4

Because of the relatively affordable price of its rental units, Young Apartments' apartment complex—as well as most of the Center Street area—was occupied primarily by these Hispanic immigrant workers. Young Apartments estimates that the immigrant population in Jupiter at the time of its amended complaint consisted of approximately 3000 people, mostly from Mexico and Guatemala, including 200 to 300 families and a ratio of approximately 70% men to 30% women.

The increasing presence of the Hispanic immigrant population in the Center Street area was a topic of concern for some of Jupiter's citizens. Young Apartments states that some Jupiter citizens believed these immigrant workers were living and working in their community illegally. Some Jupiter residents also believed that Hispanic immigrants were hurting the town's economy by taking local jobs and using public resources. One Jupiter resident was quoted in national news reports as claiming that "[t]he landlords here are harboring illegal aliens, and it's depressing our property values."

Young Apartments alleges that Jupiter was especially troubled by the gathering of these workers around Center Street, where they were picked up by employers to be transported to their daily jobs. As a result, soon after Young Apartments purchased the property on Center Street, Jupiter allegedly began implementing and enforcing policies and practices intended to eliminate the

presence of these immigrant workers. One of these policies was to target landlords, such as Young Apartments, who provided affordable housing to Hispanic immigrants through a campaign of "excessive and selective" housing inspections.

Young Apartments alleges that Jupiter adopted Ordinance No. 6-04 (the "Overcrowding Ordinance" or the "Ordinance") on May 4, 2004 as part of this effort to eliminate available and affordable housing for Hispanic immigrant workers. According to Young Apartments, the discriminatory motive behind this ostensibly neutral ordinance was clear throughout the enactment process. For example, Young Apartments quotes participants at a January 2004 meeting of the of the Jupiter Planning and Zoning Commission as stating that the proposed Ordinance was intended to eliminate the "problem" posed by "the workers on Center Street." Jupiter officials allegedly reassured local residents that a "complaint-driven" scheme focusing on overcrowding would allow the town to target only the landlords of Hispanic immigrant tenants for enforcement, without affecting the rights of other property owners. Jupiter adopted the Ordinance despite the warning of at least one advocate for the local immigrant population that an overcrowding measure enforced only against Hispanic residents raised the specter of potential civil rights violations.

Young Apartments claims that individual defendants Lukasik (Jupiter's Town Manager appointed to execute the Town's policies) and Lecky (Jupiter's Building Official in charge of administering the Building and Building Regulation provisions of the Jupiter Code of Ordinances) both partook in the decision-making process leading up to the enactment of the Overcrowding Ordinance as well as its enforcement. The Overcrowding Ordinance adopted in May 2004 requires, among other things, that no more than five persons occupy any housing unit, unless all members of the housing unit are related by blood or marriage. The Ordinance also provides an exemption to the five-person maximum occupancy limitation for children less than eighteen years old.[2]

After the May 2004 adoption of the Overcrowding Ordinance, the Jupiter Town Council continued to discuss the problems posed by immigrant laborers. On

---

[2] The Overcrowding Ordinance is codified in Article VIII of the Jupiter Housing Code at Sections 21-206, 21-254, and 21-255. Section 21-206, containing the five-person limitation, provides that "[f]amily is one or more persons occupying a single housekeeping unit and using common cooking facilities; provided that unless all members are related by blood or marriage, no such family shall contain over five persons." Section 21-254 assigns levels of occupants to square footage levels, setting forth limitations on the number of occupants based on available space, with an exemption for children under the age of eighteen. Finally, Section 21-255 provides that "[a]n unlawful structure is one found in whole or in part to be occupied by more persons than permitted under this Code or was erected, altered or occupied contrary to law. Such structures are deemed unfit for human occupancy and shall be vacated unless the number of occupants is reduced to meet the requirements of section 21-254. Failure of the owner to comply will cause the premises to be condemned and utility services terminated to the property pending compliance with this chapter." Once a rental property has been condemned, its owner may not lease that property to tenants until it has been brought into compliance with the Housing Code.

October 26, 2004, the Town Council held a workshop to consider the development

of a "day labor center" where employers could meet and arrange jobs with local

workers.[3]  Opponents of the day labor center reportedly criticized the inadequate

enforcement of the Overcrowding Ordinance and the continued presence of

allegedly undocumented immigrant workers in the Center Street area.  Town

officials and citizens at that meeting also questioned whether the Overcrowding

Ordinance had been effective in getting rid of immigrant laborers living in Jupiter.

Lecky and Lukasik, among other Jupiter officials, reportedly responded to such

concerns by pledging to continue code enforcement efforts in the Center Street

area.

Citizen opposition to the presence of Hispanic immigrants continued to be

voiced at subsequent Town Council meetings and elsewhere.  Jupiter residents

reportedly complained that these immigrants were living and working in Jupiter

---

[3] Although the fate of the day labor center is not addressed in the record before us, news reports show that Jupiter later assisted in the development of the El Sol Jupiter Labor Center. The El Sol Center provides a location for employers to hire workers, in order to keep these workers from loitering in the Center Street area, and also provides social services to Jupiter's Hispanic immigrant community.  See, e.g., Pamela Perez, Jupiter Day-Labor Center Dedicated, Palm Beach Post, June 3, 2006, at 3B.  Indeed, although the present litigation involves allegations that Jupiter discriminated against its Hispanic immigrant residents, the Town has more recently come under fire from protestors who object to Jupiter's support for the El Sol Center and complain that the Town has provided too much assistance to these same immigrant residents.  See, e.g., Dwayne Robinson, Anti-Immigrant Protest Targets Day-Labor Site, Palm Beach Post, Mar. 2, 2008, at 3C.

illegally, and that they were sending their wages back to their home countries rather than reinvesting their money into Jupiter's economy. Jupiter allegedly responded to such complaints by increasing its enforcement of the Overcrowding Ordinance, in order to put additional pressure on Hispanic immigrants (and their landlords) to leave the Town.

Young Apartments alleges that audience members at a January 4, 2005 Town Council meeting once again pressed Jupiter officials to use the Overcrowding Ordinance to "solve the perceived Center Street day laborer problem." One week later, in the pre-dawn hours of January 11, 2005, Jupiter Building Official personnel and Jupiter Police Officers, along with perhaps others, entered the thirty rental units on Young Apartments' property without seeking the consent of Young Apartments and without an inspection warrant, in order to conduct an inspection for violations of Jupiter's Overcrowding Ordinance.

As a result of the inspections, Jupiter initiated four separate Code Enforcement Board cases against Young Apartments. Jupiter cited violations of the Overcrowding Ordinance as well as physical defects on the property resulting from hurricane damage in September 2004. Young Apartments claims that it was already in the process of repairing hurricane damage to the property at the time of the January 11, 2005 raid. Jupiter initially gave Young Apartments until January

21, 2005 to cure all of the defects, a deadline that Young Apartments claims was "literally impossible" to meet.

Prior to these inspections, in December 2004, Young Apartments had entered into a contract to sell the property for $3.75 million. A meeting took place on January 21, 2005 between Jupiter and Young Apartments, at which Lecky was present. The purpose of the meeting was to discuss the four Code Enforcement Board cases, which were set to be heard five days later. Knowing that the apartment complex could be demolished if all the defects were not corrected by February 18, 2005—a new deadline which had been set by Jupiter in a January 21, 2005 letter to Young Apartments—and having signed a contract to sell the property for $3.75 million, Young Apartments negotiated an agreement with Jupiter to avoid demolition of the property. Under the terms of the agreement, or Agreed Order, Young Apartments conceded its code violations and waived its right to be heard by the Board. The parties agreed to a three-tier schedule for repairs, which required Young Apartments to remedy most code violations by January 28, 2005; to have a remediation plan for mold in place by February 4, 2005; and to complete roof repairs by February 18, 2005. The Agreed Order also stated that Young Apartments would be assessed fines of $250 per day if the violations continued after these agreed-upon dates.

Young Apartments met the first two of its repair deadlines, but it was unable to complete roof repairs made necessary by hurricane damage by February 18, 2005. As a result, on February 24, 2005, after an inspection of the property that found roof problems, missing dry-wall and exposed wiring, Jupiter condemned fourteen of the thirty units and ordered that the units be vacated. Young Apartments claims that Jupiter singled its property out for enforcement, and that its inability to complete roof repairs in such a short time span was "not surprising, since hundreds of other properties in Jupiter that had [received] damage from the Hurricanes during the same time period remained unrepaired as of that time as well." Young Apartments states that the condemnation of the fourteen units led its buyer to cancel the property purchase agreement on March 4, 2005. This cancelled contract, along with revenue lost from the fourteen vacated units, resulted in financial loss to Young Apartments. Young Apartments continued to conduct roof repairs after vacating the apartments, and obtained certificates of occupancy for all of the units by July 22, 2005.

Young Apartments alleges that Jupiter intended, through its enactment and enforcement of the Overcrowding Ordinance, to force property owners to sell or otherwise eliminate the housing available to Hispanic immigrant workers. In support it cites a subsequent Town Council meeting held on April 5, 2005, where

11

one Jupiter citizen reported that a Center Street landlord was beginning to sell off property as evidence that the Ordinance was showing signs of success. Jupiter's vice-mayor reportedly stated at this meeting that the Overcrowding Ordinance was working, and that landlords who rented overcrowded housing should be encouraged to leave town. Young Apartments claims that this meeting, and other similar town discussions, shows that the true purpose of Jupiter's code enforcement effort was to eliminate housing for Hispanic immigrant residents.

Because this appeal comes to us on a motion to dismiss, this version of events remains one-sided. Future proceedings may show the motives of Jupiter and its officials to be more balanced than alleged by Young Apartments. A review of Jupiter Town Council minutes, which were submitted into the district court record during proceedings subsequent to this motion to dismiss, certainly suggests that Jupiter's residents and officials were sharply divided in their opinions about the issues raised here. But it is not the role of a court of appeals to review such evidence in the first instance. Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3d 1295, 1306-07 (11th Cir. 2006). We instead look to the district court to make appropriate findings of fact on remand.

**(2)**

**Procedural History**

On August 22, 2005, Young Apartments filed a complaint against Jupiter, Lukasik, and Lecky. In its seven-count amended complaint filed on November 15, 2005, Young Apartments alleged, <u>inter alia</u>, claims under 42 U.S.C. § 1983 as well as a claim for breach of the Agreed Order. Four causes of action of the complaint are against Jupiter while the other three are against Lukasik and Lecky. The complaint alleges violations of the Fourteenth Amendment against Jupiter for its enactment and enforcement of the Overcrowding Ordinance (Count I) and the February 24, 2005 condemnation action (Count VI). The complaint also raises similar claims under the Fourteenth Amendment against Lukasik and Lecky (Counts II and V). It also alleges violations of the Fourth Amendment against Jupiter (Count IV) and Lukasik and Lecky (Count III). Finally, Young Apartment brought a cause of action for breach of contract against Jupiter (Count VII).

In its Omnibus Order dated January 13, 2006, the district court dismissed Counts II, III, IV, V, and VII of the amended complaint. The district court granted Lukasik and Lecky's motion to dismiss in its entirety, finding that the amended complaint did not state a cause of action against them in their individual capacities, thereby dismissing Counts II and IV. The court also dismissed Count

13

III against Lukasik and Lecky because it found that Young Apartments lacked standing to assert a Fourth Amendment violation. With respect to Jupiter, the district court dismissed all claims except those related to the selective enforcement of the Overcrowding Ordinance. The court found that Young Apartments did not have standing to assert a race-based discrimination claim on behalf of its Hispanic residents. Because the court concluded that it lacked such standing, it conducted its analysis under Count I based on differential treatment of a non-suspect characteristic and concluded that the Overcrowding Ordinance had a rational basis—to promote sanitation, public health and safety.

With the case proceeding solely against Jupiter, and the only surviving claim being the selective enforcement of the Ordinance under Counts I and VI, the court granted summary judgment in favor of Jupiter on March 30, 2007. This appeal followed. On appeal, Young Apartments does not contest the court's granting of summary judgment in favor of Jupiter with respect to the unlawful condemnation claims of Count VI and the "class of one" selective enforcement claims of Count I. Furthermore, Young Apartments does not contest dismissal of its Fourth Amendment claims (Counts III and IV) against both Jupiter as well as Lukasik and Lecky, nor does it contest the dismissal of its equal protection claim under Count V against Lukasik and Lecky for the selective condemnation of its

14

property. Thus, the only issues on appeal relate to the district court's determinations that (1) Young Apartments lacked standing to bring a race-based discrimination claim against Jupiter under Count I, (2) Young Apartments' failure to state a cause of action against Lukasik and Lecky in their individual capacities under Count II and (3) its breach of contract claim against Jupiter under Count VII.

## DISCUSSION

## (1)

### Standard of Review

We review an order granting a motion to dismiss with prejudice de novo, applying the same standards the district court used. Hoffman-Pugh v. Ramsey, 312 F.3d 1222, 1225 (11th Cir. 2002). All of the factual allegations in the complaint must be accepted and construed in the light most favorable to the plaintiff. Beck v. Deloitte & Touche, 144 F.3d 732, 735 (11th Cir. 1998). A motion to dismiss does not test the merits of a case, but only requires that "the plaintiff's factual allegations, when assumed to be true, 'must be enough to raise a right to relief above the speculative level.'" Mills v. Foremost Ins. Co., 511 F.3d 1300, 1303 (11th Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, ___U.S. ___, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)).

15

### Count I:  Young Apartments Has Standing to Challenge the Overcrowding Ordinance as Discriminatory.

Young Apartments' first cause of action claims that Jupiter violated the Equal Protection Clause of the Fourteenth Amendment by enacting the Overcrowding Ordinance and then enforcing it only against properties that housed Hispanic immigrant tenants.  The district court divided these allegations into an "enactment" claim and an "enforcement" claim.  The court held that Young Apartments did not have standing to challenge Jupiter's actions as racially discriminatory for either of these claims, because "a non-Hispanic landlord lacks standing to bring a race discrimination claim on behalf of its Hispanic residents." (D. Ct. Op. at 7.)  Therefore, the court found that Young Apartments could not challenge the enactment of the ordinance on the basis of a suspect classification, and instead scrutinized the ordinance under a rational basis standard of review. The court upheld the ordinance as valid under this rational basis review, and dismissed the enactment claim.  Because Young alleged that other similarly-situated landlords were not targeted for enforcement, the court allowed Young's selective enforcement claim to move forward under a "class of one" analysis. Young Apartments is currently only challenging the district court's denial of

standing to challenge Jupiter's actions as racially discriminatory, and not the subsequent summary judgment ruling in which the district court found that Young Apartments could not prevail on its selective enforcement claim.

The analytical framework for resolving standing issues requires consideration of both "constitutional" and "prudential" requirements for standing. Warth v. Seldin, 422 U.S. 490, 498-99 (1975); Harris v. Evans, 20 F.3d 1118, 1121 (11th Cir. 1994) (en banc). "The constitutional requirements derive from Article III's limitation of federal jurisdiction to situations where a justiciable 'case or controversy' exists between the litigants." Harris, 20 F.3d at 1121 (citing Warth, 422 U.S. at 498). The Eleventh Circuit has explained that to meet the requirements of Article III, "the plaintiff must show: (1) that he has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling." Id. (citing Saladin v. Milledgeville, 812 F.2d 687, 690 (11th Cir. 1987)). If a plaintiff cannot satisfy these constitutional standing requirements, the case lies outside the authority given to the federal courts by Article III and must be dismissed. Id.

At the initial pleading stage, a plaintiff may establish standing based on general factual allegations of injury. Miccosukee Tribe of Indians v. S.

17

Everglades Restoration Alliance, 304 F.3d 1076, 1080 (11th Cir. 2002).  Because this issue reaches us on a motion to dismiss, we must presume that a plaintiff's allegations are sufficient to establish the facts alleged.  Id.  Under this standard of review, there is no dispute that Young Apartments' allegations fulfill all three of these constitutional requirements.  Young Apartments has suffered a financial injury based on lost rent and the lost sale of its property.  It claims that this injury was caused by Jupiter's enactment of the Overcrowding Ordinance and the Town's subsequent enforcement measures.[4]  Young Apartments' injury would be remedied by the proposed damages and injunctive relief, which would compensate Young Apartments for the loss in its property's value and prevent future unlawful

---

[4] Jupiter argues on appeal that Young Apartments' financial loss was not actually caused by the Overcrowding Ordinance.  In support, Jupiter notes that all of Young Apartments' overcrowding violations were cleared up within days of the raid.  Jupiter thus argues that any financial losses suffered by Young Apartments were solely caused by its failure to perform necessary repairs in a timely manner.  Young Apartments responds that Jupiter's raid to inspect for overcrowding violations, in and of itself, was a cause of its financial losses.  Young Apartments also argues that Jupiter threatened to demolish its property if it did not perform all of its hurricane-related repairs within an impossibly short amount of time.  Construing these allegations in favor of plaintiff, as we must at this stage, it is possible that Jupiter's pre-dawn raid could injure Young Apartments as part of a concerted selective enforcement campaign intended to drive away its Hispanic immigrant tenants.

We do not comment on the merits of either side's assertions here.  This matter comes to us on a motion to dismiss.  Accordingly, this panel must decline the invitation to weigh the evidence for such arguments.  The necessary findings of fact – about the enactment of the Overcrowding Ordinance and whether it was a cause of Young Apartments' injuries – must be addressed by the district court in the first instance.  See Primera Iglesia Bautista Hispana, 450 F.3d at 1306-07.

enforcement actions. Accordingly, the amended complaint fulfills the constitutional requirements for standing.

In addition to the constitutional requirements of Article III, the Supreme Court has also instructed courts to consider three prudential principles when weighing whether judicial restraint requires the dismissal of a party's claims. Warth, 422 U.S. at 499-500; Bischoff v. Osceola County, 222 F.3d 874, 883 (11th Cir. 2000). The Eleventh Circuit has summarized these prudential considerations as:

> 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

Harris, 20 F.3d at 1121 (quoting Saladin, 812 F.2d at 690).

The district court found that Young Apartments lacked "standing to complain of the alleged racial or ethnic discrimination by" Jupiter, because it believed that "a non-Hispanic landlord lacks standing to bring a race discrimination claim on behalf of its Hispanic residents." (D. Ct. Op. at 6-7.) This ruling, however, is erroneous for two reasons. First, this ruling ignores that Young Apartments is suing Jupiter to remedy its own mistreatment, which it

19

claims resulted from Jupiter's discriminatory targeting of its Hispanic tenants. Accordingly, Young Apartments has standing under § 1983 to vindicate its own rights, which are distinct from the rights of its Hispanic tenants. Second, to the extent that Young Apartments is raising claims that implicate the rights of its Hispanic tenants, the district court wrongly concluded that prudential considerations should prevent Young Apartments from bringing such claims.

i.     *Young Apartments Has Standing Based on Its Own Injury.*

Young Apartments' first cause of action alleges that Jupiter enacted and enforced the Overcrowding Ordinance in order to harass landlords who provide affordable housing to Hispanic immigrants in the Center Street area. Although Jupiter's alleged animosity toward its Hispanic residents is at the heart of this claim, Young Apartments seeks to remedy its own injury. Courts have routinely found that a business has standing to bring § 1983 claims against state officials who are harming its business by discriminating against its customers. This rule of law is based on the uncontroversial principle that it is unconstitutional for a state actor, motivated by discriminatory animus, to interfere with an individual's right to contract or associate with members of a protected class. See Adickes v. Kress & Co., 398 U.S. 144, 151-52 (1970); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969).

20

This Court's ruling in <u>Baytree of Inverrary Realty Partners v. City of</u> <u>Lauderhill</u>, 873 F.2d 1407 (11th Cir. 1989), illustrates this principle. Plaintiff Baytree, a real estate developer, claimed that the defendant city had refused to amend its zoning ordinance in order to prevent Baytree from developing low-income housing. Baytree filed a civil rights suit against the city which alleged that the zoning decision was racially discriminatory. This Court found that Baytree had standing to make this claim based on its <u>own</u> injury, in language that is well suited to the current case:

> The defendants argue that there is no standing in this case, however, because of the so-called "prudential" limitations. These prudential principles recognize, <u>inter alia</u>, that even a plaintiff who has satisfied the Article III requirements must still assert his own legal rights and interests, and not those of third parties. [<u>See</u> <u>Valley Forge Christian</u> <u>College v. Americans United for Separation of Church and State</u>, 454 U.S. 464, 474-75, 102 S. Ct. 752, 759-60 (1982).] The district court held that Baytree, a non-minority developer, had no standing because it was asserting the rights of hypothetical third persons. Whether non-minority developers have standing to pursue civil rights claims which allege that a local government's zoning decisions have a discriminatory adverse effect on racial minorities is an issue left open by the Supreme Court. [<u>See</u> <u>Village of Arlington Heights v.</u> <u>Metropolitan Hous. Dev. Corp.</u>, 429 U.S. 252, 263-64 & n.9, 97 S. Ct. 555, 562-63 & n. 9 (1977).] That, however, is not the case here, for Baytree argues its own injury from zoning decisions which are motivated by racial animus, not the injury that would be incurred by prospective tenants.

21

Baytree, 873 F.2d at 1408-09. Similarly, Young Apartments has standing to allege that it was injured by Jupiter's discriminatory actions, regardless of whether such claims might also vindicate the rights of its immigrant tenants.

Other courts have similarly found that a non-minority plaintiff has standing to allege that it was injured by defendants' discriminatory animus toward third parties. The non-minority plaintiff's own injury is sufficient to confer standing, separate from the question of whether the non-minority plaintiff also has standing to vindicate the rights of third parties. See Scott v. Greenville County, 716 F.2d 1409, 1415 (4th Cir. 1983) (concluding that non-minority housing developer had standing to make an equal protection claim under § 1983, because "if defendants singled out [plaintiff] for disadvantageous treatment because of his willingness to house minority tenants, then [plaintiff] in his own stead suffered injury to his right to be free from official discrimination"); Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 17 (1st Cir. 1979), vacated on other grounds, 454 U.S. 807 (1981) (finding that real estate corporation has standing under § 1983 to allege that state municipal corporation discriminated against it for its willingness to sell housing to low-income and minority families); Pagliuco v. City of Bridgeport, No. 3:01-CV-836, 2005 U.S. Dist. LEXIS 33738, at *16-17 (D. Conn. Dec. 13, 2005) (finding that club owners have standing to bring equal protection claims under § 1983 alleging

they were singled out for enforcement because of their African-American clientele; explaining that prudential bar against third-party standing is not relevant because "[p]laintiffs are not attempting to vindicate the rights of their clientele. They are asserting their own right to be free from unequal enforcement of the laws based on discriminatory criteria - namely the race of their patrons."); Hallmark Developers, Inc. v. Fulton County, No. 1:02-cv-01862-ODE, 2004 U.S. Dist. LEXIS 30616, at *51 (N.D. Ga. Sept. 27, 2004) (finding that plaintiff housing developers "have Article III standing to vindicate, at a minimum, their own rights" under § 1983 based on allegations that discriminatory zoning decisions prevented development of housing for low-income and minority residents); Pisello v. Town of Brookhaven, 933 F. Supp. 202, 212 (E.D.N.Y. 1996) (finding that management company had standing to maintain equal protection claims under § 1983 where plaintiff alleged it was singled out for enforcement actions due to its efforts to place minority tenants in local rental housing); Puglisi v. Underhill Park Taxpayer Assoc., 947 F. Supp. 673, 689 (S.D.N.Y. 1996) (finding that non-minority landlord had standing to vindicate his own rights under § 1983 based on

23

allegations that he was targeted for enforcement in effort to drive out his African-American tenants).[5]  As the First Circuit explained in the <u>Des Vergnes</u> case:

> [A] State may not punish a non-white for having social contacts with a black.  Likewise it may not through one of its creatures, punish or discriminate against a corporation for its willingness, past or present, to make contracts with blacks.  And if it does so, then the person so punished or discriminated against has a § 1983 right of action.

<u>Des Vergnes</u>, 601 F.2d at 17 (citations omitted).   Because Young Apartments alleges that it was directly injured by Jupiter's enactment and enforcement of the Overcrowding Ordinance, it has standing – on its own behalf – to challenge the allegedly discriminatory nature of Jupiter's actions.

> ii.     *Prudential Principles of Standing Do Not Bar Young Apartments' Claims.*

Prudential principles of third-party standing also present no bar to Young Apartments' standing in this case.  These prudential principles "are not constitutionally mandated, but rather stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the

---

[5] The district court wrongly cited <u>Puglisi</u>, 947 F. Supp. at 692, as holding that a "non-minority landlord lacked standing to bring race discrimination action against local residents and municipal officials who allegedly attempted to force landlord to evict minority tenants and engaged in selective enforcement of ordinances, housing codes, and fire and zoning regulations." (D. Ct. Op. at 7.)  <u>Puglisi</u> in fact found that a landlord <u>did</u> have standing to bring such claims under § 1983.  <u>Puglisi</u>, 947 F. Supp. at 689.  The section selectively cited by the district court only found that the landlord did not have standing to bring such claims under 42 U.S.C. § 1985(3), which the <u>Puglisi</u> court said had never been extended to apply to a plaintiff who was not a member of the class protected by the statute.  947 F. Supp. at 692.

applicable questions are ill defined and speculative." Craig v. Boren, 429 U.S. 190, 193 (1976). In an ordinary case, a plaintiff is denied standing to assert the rights of third parties. Warth v. Seldin, 422 U.S. 490, 499 (1975). One exception to this rule, however, allows businesses to advocate, on behalf of their clients and customers, against discriminatory actions that interfere with that business relationship. See Craig, 429 U.S. at 195 ("[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."). This exception applies to the current case.

In order to bring claims on behalf of third parties, a litigant must satisfy three important criteria.

> [T]he litigant must have suffered an "injury-in-fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests.

Harris v. Evans, 20 F.3d 1118, 1122 (11th Cir. 1994) (quoting Powers v. Ohio, 499 U.S. 400, 411 (1991) (citations omitted)). All three of these criteria are met in the current case.

First, as already noted, Young Apartments has sufficiently alleged that it has a concrete interest in the outcome of this dispute. Young Apartments' pursuit of

25

economic damages is sufficient to ensure that it would be an effective advocate in this dispute. See Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, 1212-13 (8th Cir. 1972). This prong weighs particularly strongly in favor of standing for Young Apartments, because it claims an economic injury (for the loss in value of its housing property) that would not be remedied in a suit brought by the immigrant tenants themselves. See Puglisi, 947 F. Supp. at 688.

Second, the interests of Young Apartments and its tenants are sufficiently aligned to ensure that Young Apartments will properly frame the issues in this dispute. See Harris, 20 F.3d at 1123. The district court found that Young Apartments had no standing because its interests were not "intimately close" to the interests of its tenants. (D. Ct. Op. at 7 n.4.) But this test is overly strict. The appropriate question is whether the identity of interests between plaintiff and the third party are "sufficiently close." As another circuit court has stated, "[t]hough, generally speaking, the right to equal protection is a personal right of individuals, this is 'only a rule of practice,' which will not be followed where the identity of interest between the party asserting the right and the party in whose favor the right directly exists is sufficiently close." Brewer v. Hoxie Sch. Dist. No. 46, 238 F.2d 91, 104 (8th Cir. 1956) (emphasis added & internal citations omitted).

26

The district court adopted the "intimately close" test from <u>Clifton Terrace</u>

<u>Assocs., Ltd. v. United Tech. Corp.</u>, 929 F.2d 714, 721 (D.C. Cir. 1991), which in

turn was quoting <u>Park View Heights</u>, 467 F.2d at 1213-14.  But the <u>Park View</u>

<u>Heights</u> case explicitly states that the applicable test is whether the interests are

"sufficiently close," not "intimately close."  The Eighth Circuit, in the passage at

issue, found that plaintiff affordable housing developers had standing to raise

discrimination claims on behalf of their prospective tenants, because the identity

of interests between these parties "is not only <u>sufficiently close</u>, so as to satisfy the

<u>Brewer</u> test, but intimately close."  <u>Id.</u> at 1214 (emphasis in original).  The court

was simply stating that the alignment of interests in that case went beyond what

was required in order for the plaintiff to have standing to bring a racial

discrimination claim on behalf of minorities.  Nowhere did it adopt an "intimately

close" test.[6]

---

[6] Additionally we note that <u>Clifton Terrace</u>, which was relied on by the district court for its standing ruling, is factually distinguishable from this case.  While the case was similar in that an owner of a low-income housing complex sought to sue on behalf of its African-American residents, no claim was brought under § 1983.  The court found that the owner lacked standing to sue under 42 U.S.C. § 1981 and § 1982.

Based on the allegations currently before us, the standing questions raised by these cases also differ on the merits.  The D.C. Circuit concluded that Clifton Terrace and its tenants had diverging interests, so that the landlord could not be trusted to be an appropriate advocate for the rights of its tenants.  <u>Clifton Terrace</u>, 929 F.2d at 721.  In contrast, we have found that the interests of landlord and tenant are sufficiently aligned to permit standing in this case.  The D.C. Circuit also found that "[t]he fact that the tenants could have brought their own action . . . argues against allowing Clifton to assert their rights as a third party." <u>Id.</u>  While this is a relevant factor, as explained below, we find that the tenants in the current case may be hindered from asserting

27

In finding that Young Apartments' interests are sufficiently aligned with its tenants, we acknowledge that the interests of this landlord and its tenants are not identical. Indeed, we find some merit in Jupiter's warning that a landlord should not be permitted to attack a town housing ordinance on behalf of its tenants, when such ordinances are generally intended to protect the health and safety of tenants against unscrupulous landlords. However, the facts alleged in Young Apartments' complaint, if accurate, paint a scenario in which both the Hispanic immigrant tenants and their landlords were targeted by Jupiter officials, through a single course of conduct intended to drive the tenants out of town and the landlords out of business. Moreover, because Jupiter is allegedly targeting Hispanic immigrants by taking measures against their landlords, it would be difficult (if not impossible) for Young Apartments to vindicate its own rights fully without implicating the rights of its tenants. Accordingly, the facts as alleged depict a sufficiently close relationship between Young Apartments and its tenants to ensure that Young

---

their own rights in court, so that this also should not prevent Young Apartments from having standing to bring its claims.

28

Apartments will be a zealous advocate of the legal rights at issue in the suit.[7]  See

Park View Heights, 467 F.2d at 1213.

Third, Young Apartments is an appropriate plaintiff because of the

likelihood that its tenants would be hindered from asserting their own rights in this

case.  Here, the district court erred by only asking whether these tenants are

"plainly identifiable."  (D. Ct. Op. at 7 n.4.)  While the inability to identify

appropriate minority plaintiffs is one reason to grant third-party standing in a civil

rights case, it is not the only reason.  See Puglisi, 947 F. Supp. at 687-88 (finding

that third-party standing is not limited to cases where appropriate minority

plaintiffs are not readily identifiable).  A court's inquiry into whether or not a

minority plaintiff is readily identifiable is part of a larger inquiry into whether the

existing plaintiff is "uniquely positioned" to vindicate the rights of the third-party

minorities in question.  See Doe v. Village of Mamaroneck, 462 F. Supp. 2d 520,

547 (S.D.N.Y. 2006).  The court must also ask whether it "would be difficult if not

---

[7] In so concluding, we do not intend to endorse a general rule that a landlord always has standing to represent the interests of its tenants.  But the district court has made no findings of fact regarding the relationship between Young Apartments and its tenants that would contradict the allegations in the amended complaint.  Jupiter argues that Young Apartments (like the landlord in the Clifton Terrace case decided by the D.C. Circuit) is actually in an adversarial position to its tenants due to its violations of the town building code.  Cf. Clifton Terrace, 929 F.2d at 721 (denying standing where landlord's "interests in the subject of this suit to some extent conflict with those of the tenants whose rights it purports to advance").  This issue, however, requires a fact-specific inquiry that must be addressed by the district court in the first instance.

29

impossible for the persons whose rights are asserted to present their grievance before any court." Barrows v. Jackson, 346 U.S. 249, 257 (1953). If that is the case, then "the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied" otherwise. Id.

In this case, Young Apartments is uniquely positioned to assert claims on behalf of its Hispanic residents. Young Apartments is subject to enforcement under the Overcrowding Ordinance, and claims to have suffered significant financial injury under that ordinance, so that it has strong incentives to pursue this lawsuit. It has shown that it is willing and able to pursue this claim in court. By contrast, according to the allegations in the complaint, its Hispanic tenants face hostility from the residents of Jupiter and may be reluctant to raise such claims for fear of provoking additional policing measures. It is also reasonable to presume that some of the immigrants living in Jupiter may fear drawing attention to the immigration status of themselves or their neighbors, and that Young Apartments' immigrant tenants could fear that a lawsuit against Jupiter would invite other legal risks. Under such circumstances, Young Apartments stands in a unique position to vindicate its tenants' rights.

In short, Young Apartments alleges that Jupiter adopted the Overcrowding Ordinance in order to reduce the amount of housing available to Hispanic immigrant workers in Jupiter. It contends that its property was specifically targeted by Jupiter officials because it provided affordable housing to these Hispanic immigrant workers. Taking Young Apartment's allegations to be true, there is a sufficient nexus of interests to establish that Young Apartments will be a zealous advocate of the rights at issue in this suit. Moreover, denying Young Apartment standing to raise these claims would unfairly limit its ability to vindicate its own right to be free from official misconduct. Therefore, Young Apartments is uniquely positioned, and should have standing, to bring a discrimination claim on behalf of its Hispanic immigrant tenants.

In reaching these conclusions, we do not offer any judgments about the merits of Young Apartments' allegations. But a standing ruling at the motion to dismiss stage should only address the sufficiency of the allegations in a complaint, not their merits. Miccosukee Tribe of Indians v. S. Everglades Restoration Alliance, 304 F.3d 1076, 1080 (11th Cir. 2002). Accepting the facts in Young Apartments' complaint, as we must, Young Apartments has standing to pursue these discrimination claims against Jupiter.

*iii. Young Apartments' Claims are Subject to Strict Scrutiny on Remand.*

Because the district court believed that Young could not challenge the Overcrowding Ordinance on the basis of a suspect classification, the district court reviewed the ordinance under the rational basis test of Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995). However, because Young Apartments has standing to attack this ordinance as racially discriminatory, a stricter standard of review is appropriate. As we have previously stated, "[a] facially-neutral law violates the Equal Protection Clause if adopted with the intent to discriminate against a racial group." Johnson v. Governor of Florida, 405 F.3d 1214, 1222 (2005) (en banc) (citing Washington v. Davis, 426 U.S. 229, 239 (1976)). Johnson provides the appropriate legal framework for claims that a facially neutral statute was enacted to further unlawful discrimination: such a law is unconstitutional if (1) "discrimination was a substantial or motivating factor" in the government's enactment of the law, and (2) the government cannot rebut that claim by showing "that the provision would have been enacted in the absence of any racially discriminatory motive." Johnson, 405 F.3d at 1223 (citing Hunter v. Underwood, 471 U.S. 222, 227-28 (1985)).

Determining whether invidious discriminatory purpose was a motivating factor in adopting a statute or ordinance demands a sensitive inquiry into such

32

circumstantial and direct evidence of intent as may be available. Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977). The impact of the official action—that is, whether it bears more heavily on one race than another—may provide an important starting point. Id. However, unless there is a clear pattern that the action is impacting one race more than another, impact alone is not determinative, and courts must look to other evidence such as the historical background behind the state's action and the specific sequence of events in the state's decision-making process. Id. at 266-68. If Young Apartments is able to show that racial discrimination was a substantial or motivating factor in enacting the Overcrowding Ordinance, based on such evidence, then the burden would shift to Jupiter to demonstrate that the provision would have been enacted in the absence of any racially discriminatory motive.

A more difficult question is raised by the impact of our standing decision on Young Apartments' unequal enforcement claims. Jupiter argues that the unequal enforcement claim has already been fully decided, because the district court granted Jupiter summary judgment on this issue and Young Apartments failed to appeal that ruling. The district court applied a "class of one" analysis to Young Apartments' unequal enforcement claims, which excluded any consideration of discrimination based on a suspect classification. Under the "class of one"

33

analysis, "Plaintiffs must show (1) that they were treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiffs." Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006) (citing Strickland v. Alderman, 74 F.3d 260, 264 (11th Cir. 1996)). Jupiter correctly observes that a plaintiff must satisfy the "similarly situated" prong of this test, whether or not its discrimination claim is based on a suspect classification. See Griffin Indus. v. Irvin, 496 F.3d 1189, 1204-05 (11th Cir. 2007) (finding that the same strict "similarly situated" standard applies whether an equal protection claim is brought under a "class of one" theory or a traditional theory of unlawful discrimination); Sweet v. Sec'y, Dep't of Corr., 467 F.3d 1311, 1318-19 (11th Cir. 2006) (explaining in context of habeas ruling that "[t]o establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis"); Hollywood Cmty. Synagogue, Inc. v. City of Hollywood, 430 F. Supp. 2d 1296, 1322 (S.D. Fla. 2006) (applying the two-part test from Campbell where synagogue claimed it was being targeted for selective code enforcement because of anti-religious bias). Therefore, Jupiter is

correct that Young Apartments must show disparate treatment compared to a similarly situated party, whether it is alleging discrimination based on a suspect classification or under a "class of one" theory.

Nonetheless, Young Apartments claims that it was unable to introduce relevant evidence concerning Jupiter's discriminatory motives. It also claims that the district court's analysis failed to examine fully whether Young Apartments was treated differently compared to landlords of non-Hispanic tenants. Because the summary judgment order was not appealed, and the district court's ruling that Young Apartments could not prove discrimination compared to similarly situated parties is not before us, we do not address the merits of these arguments. However, it does appear that the district court's subsequent summary judgment order was affected by its erroneous ruling on standing, and that the district court may have wrongly refused to consider any evidence of discrimination against Jupiter's Hispanic immigrants. See Young Apartments, Inc. v. Town of Jupiter, No. 05-80765-CIV, 2007 U.S. Dist. LEXIS 24073, at *13-14 (S.D. Fla. March 30, 2007) ("Plaintiffs do not have standing to complain of the alleged racial or ethnic discrimination by Defendant. Thus, Plaintiffs can only bring this action because of differential treatment based on a non-suspect characteristic, such as the proximity of the properties to Center Street."). Therefore, Young Apartments may

raise its unequal enforcement claims anew on remand, but only insofar as it can establish these claims based on evidence of discrimination that it was unable to adduce because of the district court's erroneous narrowing of the relevant issues. Young Apartments may not press forward with any selective enforcement claims that merely duplicate its failed "class of one" unequal enforcement challenge.[8]

**(3)**

### Count II: Lukasik and Lecky Had Notice They Were Being Sued in Their Individual Capacities.

The district court, in its January 13, 2006 ruling on the motions to dismiss, found that Young Apartments' complaint did not clearly specify whether Lukasik and Lecky were being sued in their official or individual capacities. The court decided that the individual defendants were being sued in their official capacity, because the complaint alleged that they engaged in discrimination while taking actions within the scope of their official duties. The court then concluded that the claims against the individual defendants should be dismissed as redundant,

---

[8] We also note that the district court's summary judgment ruling applied a rational basis standard to the second prong of the Campbell test, which asks whether "[d]efendant unequally applied a facially neutral ordinance for the purpose of discriminating against [plaintiff]." Campbell, 434 F.3d at 1314. If Young Apartments is able to reassert its unequal enforcement claims by offering new evidence of disparate treatment vis-a-vis the landlords of non-Hispanic tenants, then strict scrutiny of Jupiter's motivations would, of course, apply. See Pisello v. Town of Brookhaven, 933 F. Supp. 202, 212 (E.D.N.Y. 1996) (explaining that where a claim "addresses selective treatment based on the plaintiff's business dealings with his minority clientele," that claim is entitled to "strict scrutiny rather than rational basis analysis").

36

because Jupiter was already named as a defendant for essentially identical claims. On appeal, Young Apartments only raises one of its claims against the individual defendants, for "Unlawful Application and Enforcement of Ordinance No. 6-04." Young Apartments argues that the district court misconstrued the complaint, and that this claim was made against Lukasik and Lecky in their individual capacities. As explained below, Young Apartments is correct.

The main concern of a court in determining whether a plaintiff is suing defendants in their official or individual capacity is to ensure the defendants in question receive sufficient notice with respect to the capacity in which they are being sued. In general, plaintiffs have a duty to "make plain who they are suing and to do so well before trial." Colvin v. McDougall, 62 F.3d 1316, 1318 (11th Cir. 1995). However, plaintiffs are not required to designate with specific words in the pleadings that they are bringing a claim against defendants in their individual or official capacities, or both. Hobbs v. Roberts, 999 F.2d 1526, 1529-30 (11th Cir. 1993). "When it is not clear in which capacity the defendants are sued, the course of proceedings typically indicates the nature of the liability sought to be imposed." Jackson v. Georgia Dep't of Trans., 16 F.3d 1573, 1575 (11th Cir. 1994). Thus, while it is "clearly preferable" that a plaintiff state explicitly in what capacity defendants are being sued, "failure to do so is not fatal if the course

37

of proceedings otherwise indicates that the defendant received sufficient notice." Moore v. City of Harriman, 272 F.3d 769, 772 (6th Cir. 2001).

In looking at the course of proceedings, courts consider such factors as the nature of plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity which serve as an indicator that the defendant had actual knowledge of the potential for individual liability. Id. at 772 n.1. In examining the course of proceedings in this case, we are persuaded that Young Apartments raised claims against the individual defendants in their personal capacities, and that the individual defendants were aware of their potential individual liability.

First, in its amended complaint, Young Apartments seeks punitive damages against Lukasik and Lecky. In a § 1983 action, punitive damages are only available from government officials when they are sued in their individual capacities. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267 (1981); see also Wynn v. Southward, 251 F.3d 588, 592 (7th Cir. 2001) (observing that plaintiff's "request for punitive damages suggests an intent to sue the officers in their individual capacities").

Second, the individual defendants' Dec. 2, 2005 motion to dismiss the amended complaint was almost entirely concerned with establishing their qualified

38

immunity. In a § 1983 action, "[i]t is well-settled that qualified immunity only protects public officials from lawsuits brought against them in their individual capacity." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1184 n.16 (11th Cir. 1994). This defense is evidence that Lukasik and Lecky believed they were being sued in their individual capacities. See Tapley v. Collins, 211 F.3d 1210, 1211 n.2 (11th Cir. 2000) (treating suit as against defendants in their individual capacities where the complaint was silent but the parties briefed the issue of qualified immunity).

Third, the amended complaint included language that was intended to put the individual defendants on notice of their personal liability. For example, the amended complaint alleged that Lecky was "personally motivated by a race and national origin-based animus toward the Hispanic immigrants and an animus toward their landlords, including Young Apts." (First Am. Compl. ¶ 92.) Young Apartments also made the allegation that a "similarly situated reasonable government official" would know such actions were unlawful, which was included in the amended complaint to avoid a qualified immunity defense. (Id. ¶ 93.)

Finally, the complaint's caption refers to Lukasik and Lecky only by name and does not list their official titles. All of this evidence about the course of proceedings establishes that Young Apartments intended to sue the individual

39

defendants in their individual capacities, and that the defendants were on notice of this.

The district court identified the proper "course of proceedings" inquiry but misapplied this test. First, the district court wrongly began its analysis by citing Soper ex rel. Soper v. Hoben, 195 F.3d 845 (6th Cir. 1999), for the proposition that "a defendant may be deemed to be sued in his official capacity" when a complaint does not specify how the defendant is sued. (D. Ct. Op. at 11.) Soper, however, applied a strict pleading requirement that "plaintiffs must designate in which capacity they are suing defendants; if not, by operation of law, defendants are deemed sued in their official capacities." 195 F.3d at 853.[9] This rule, as applied by Soper, created a presumption that conflicts with our Court's "course of proceedings" test. Second, the district court's analysis relied on the fact that "Lecky and Lukasik's actions were undertaken pursuant to performance of their duties within the scope of their authority." (D. Ct. Op. at 12.) But personal liability under 42 U.S.C. § 1983 is specifically available when an official's allegedly unconstitutional actions are "within the official's authority and necessary

_____

[9] The rigidity of this rule was later questioned by the Sixth Circuit in Moore v. City of Harriman, 272 F.3d 769, 772 (2001) (en banc), which concluded that a "course of proceedings" analysis is more appropriate than the strict rule articulated by Soper.

40

to the performance of governmental functions." Hafer v. Melo, 502 U.S. 21, 28 (1991). Therefore, this cannot be the end of the analysis.

Instead, we find that Young Apartments intended to sue Lukasik and Lecky in their individual capacities, and that both defendants had sufficient notice of this fact. We reverse the district court's decision and remand for further proceedings in light of our decision. We do not address the merits of the individual defendants' claims of qualified immunity, and leave such claims to be addressed by the district court in the first instance.

**(4)**

### Count VII:  Young Apartments' Breach of Contract Claims Have No Merit.

As noted in the statement of facts, Jupiter ordered that fourteen of Young Apartments' units be vacated after an inspection on February 24, 2005 found continued roof damage, missing dry-wall and exposed wiring. Young Apartments alleges that this action violated the terms of the Agreed Order it had previously reached with Jupiter. Specifically, Young claims that the parties' Agreed Order had the force of a settlement agreement; that Jupiter was obligated under its terms to fine Young $250 per day if repairs were not completed on time; and that any other enforcement action violated the agreement.

Young Apartments' "breach of contract" claims have no merit. First, Young Apartments' argument is not supported by the terms of the Agreed Order. The agreement states that Young Apartments would be subject to daily fines if the agreed-upon timeline for repairs was not met. Young Apartments interprets this language to mean that such fines would be Jupiter's only remedy if repairs were not completed on time. But there is no language in the Agreed Order to suggest that Jupiter had negotiated away the right to engage in other enforcement actions if the repair timeline was not met, or that this agreement limited Jupiter's enforcement ability in any fashion other than to postpone fines until February 18, 2005. At most, this agreement shows that Jupiter agreed to toll any available fines for a limited period of time to allow Young Apartments to address the code violations through repairs.

Second, even if Young Apartments' interpretation of the agreement was correct, that agreement would be unenforceable under Florida law as against public policy. It has long been held that a "city can neither abdicate nor limit its police power when the continued use and availability thereof are essential to public welfare." Gardner v. City of Dallas, 81 F.2d 425, 426 (5th Cir. 1936); see also Contributors to Pennsylvania Hospital v. City of Philadelphia, 245 U.S. 20, 23 (1917); Stone v. Mississippi, 101 U.S. 814, 817-18 (1880). This general

42

principle applies under Florida law as well. See County of Volusia v. City of Deltona, 925 So. 2d 340, 345 (Fla. Dist. Ct. App. 2006) ("[A]n agreement effectively contracting away a city's exercise of its police power is unenforceable."); P.C.B. Partnership v. City of Largo, 549 So. 2d 738, 741 (Fla. Dist. Ct. App. 1989) ("The City does not have the authority to enter into such a contract, which effectively contracts away the exercise of its police powers.").

This rule of law was properly applied by the district court. Jupiter had the authority and discretion to enter into an agreement with Young Apartments to postpone condemnation while Young Apartments proceeded with repairs. But Young Apartments cannot reasonably claim that Jupiter, when faced with leaking roofs and exposed wiring, could be limited in its police power because of a prior agreement whose deadline had expired. Under Florida law, Jupiter can neither waive nor contract away its police powers.

**CONCLUSION**

For the foregoing reasons, we reverse the district court's motion to dismiss with respect to Young Apartments' standing claim and remand for the district court to consider whether Jupiter adopted and enforced the Overcrowding Ordinance with the intent to discriminate against Young Apartments' Hispanic immigrant tenants. We also reverse the district court's finding that Lukasik and

Lecky were sued solely in their official capacities.  Thus, we remand to the district court to consider the claims against Lukasik and Lecky, as well as their affirmative defense of qualified immunity.  Finally, we affirm the district court's dismissal of Young Apartments' breach of contract claim.

**REVERSED in part, AFFIRMED in part, and REMANDED.**