[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No.  11-15464
_____

D.C. Docket No. 5:08-cv-00450-CLS

I. L., et al.,

Plaintiffs-Appellants-Cross-Appellees,

versus

STATE OF ALABAMA, et al.,

Defendants-Appellees-Cross-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(January 10, 2014)

Before JORDAN and ANDERSON, Circuit Judges, and HORNBY,[*] District Judge:

JORDAN, Circuit Judge:

_____

[*] Honorable D. Brock Hornby, United States District Judge for the District of Maine, sitting by designation.

In the "best of all possible worlds,"[1] state and local governments would ensure adequate funding for all facets of their public school systems.  In the world in which we live, however, the reality is that some public school systems do not have sufficient resources to educate the children entrusted to their care.

This appeal primarily concerns a Fourteenth Amendment challenge to various sections of the Alabama Constitution that are central to the State's system of *ad valorem* property taxation.  The plaintiffs, black and white children attending public schools in Sumter and Lawrence Counties, filed suit in federal district court, asserting that these provisions are "rooted in [the State's] historic racially discriminatory policies," D.E. 31 at 16, and cripple the ability of certain rural, nearly all-black public school systems in Alabama to raise revenues.  According to the plaintiffs, the counties in Alabama's so-called "Black Belt"—a poor, largely agricultural region with a significant African-American population—have been disadvantaged under the current tax system because of "extremely low under-valuation of farm and timber land."  Appellants' Br. at 39.  The plaintiffs further allege that Alabama's constitutional limitations on millage rates restrict the ability of those in the "Black Belt" to raise property taxes and adequately fund public schools. *See id.* at 45.

The district court, following a bench trial, issued an 804-page order

---

[1] VOLTAIRE, CANDIDE, Chapter I, p.4 (Penguin Classics Deluxe Edition 2005) [1759].

2

concluding that the plaintiffs had failed to show that the challenged provisions were unconstitutional. The plaintiffs then filed this appeal. After reviewing the briefs and the extensive record, and with the benefit of oral argument, we affirm in part, and remand with instructions to dismiss without prejudice in part for lack of standing.

## I

Alabama's property tax system is no stranger to the Eleventh Circuit. As the district court noted, the current case is "a sequel to [a] long-running, higher-education desegregation action" initially filed in 1981. *See* D.E. 35 at 1.

In *Knight v. Alabama*, 476 F.3d 1219, 1220 (11th Cir. 2007), a different group of plaintiffs sought to establish a link between property tax limits for K-12 education funding and persistent segregation in Alabama's higher education system. *Knight* was initially styled as a higher education desegregation case, but the plaintiffs eventually sought to transform the case into a challenge to Alabama's tax policies. *See id.* at 1229. We ultimately determined on appeal that "even if underfunding of Alabama's K-12 schools were related to segregation in its colleges and universities, this relationship [wa]s too attenuated and rest[ed] on too many unpredictable premises to entitle [the] plaintiffs to relief under [*United States v. Fordice*, 505 U.S. 717 (1992)]." *Knight*, 476 F.3d at 1228.

We further noted in *Knight* that the plaintiffs' request for so-called

3

"additional relief"—an injunction requiring the Alabama Legislature to adequately fund K-12 schools—was "beyond [the] case or controversy" presented in that litigation. *See id.* at 1229 n.19 (internal quotation marks omitted). The plaintiffs in the current action apparently interpreted this language in *Knight* as an invitation to bring a separate lawsuit seeking to enjoin the enforcement of allegedly discriminatory property tax restrictions in Alabama's Constitution. *See* Complaint at ¶ 6. *See also* Appellants' Br. at 3 ("[P]laintiff K-12 students were acting on the invitation of the district court and this Court in *Knight v. Alabama*[.]").

The parties agree that the plaintiffs' current challenges, to the extent justiciable, are governed by the standards described in *Hunter v. Underwood*, 471 U.S. 222 (1985). *See* Appellants' Br. at 46, 56-57, 73-74; Appellees' Br. at 30, 33, 35. A facially neutral state law will not be struck down as unconstitutional "because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required." *See Hunter*, 471 U.S. at 227-28 (internal quotation marks omitted). *See also id.* at 229-33 (holding that a provision of the Alabama Constitution of 1901, which disenfranchised persons convicted of crimes involving moral turpitude, violated equal protection because, even though the provision was racially neutral, its enactment was motivated by a desire to discriminate against blacks on account of race and had a racially discriminatory effect). As we summarized in *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d

4

1027, 1043-45 (11th Cir. 2008), a law that is neutral on its face violates the Equal Protection Clause if discrimination was a substantial or motivating factor in the government's enactment of the law, and if the government cannot show that the law would have been enacted in the absence of any discriminatory motive. "[U]nless there is a clear pattern that [the law] is impacting one race more than another, impact alone is not determinative[.]" *Id.* at 1045.

The district court found that four of the challenged provisions in the Alabama Constitution (Sections 214, 215, and 216 of Article XI and Section 269 of Article XIV) were "enacted with a racially discriminatory intent," but that two later amendments to another provision of the Alabama Constitution (Amendments 325 and 373 to Section 217 of Article XI) were primarily motivated by financial considerations. *See* D.E. 296-1 at 775-76. The district court further found that, on a statewide basis, "Alabama's black citizens and black public school students [were] not disparately impacted by the challenged provisions." *Id.* at 779.

Our discussion of this complicated case is divided into three parts. First, we consider whether the plaintiffs have standing for the various claims they assert. Second, we address Alabama's contention that the action is barred by the Tax Injunction Act and principles of comity. Finally, we conclude with the merits of the claims properly before us.

## II

Alabama argues, as it did below, that the plaintiffs lack standing.  Standing is one of the Article III case or controversy requirements, *see Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008), and must therefore be established "as a threshold matter," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  To have standing, the plaintiffs must demonstrate injury in fact, causation, and redressability.  *See, e.g.*, *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301-02 (11th Cir. 2008).  Failure to satisfy any of these three requirements is fatal.  *See Fla. Wildlife Fed., Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011).

We review the plaintiffs' standing *de novo*.  *See DiMaio*, 520 F.3d at 1301. The State contends that the plaintiffs lack a cognizable injury and cannot show that any alleged injury would be redressed by the relief they request.  *See* Appellees' Br. at 17-21.  We disagree with the first contention, but concur in part with the second.

## A

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  In their complaint, the plaintiffs allege that

"racially discriminatory property tax restrictions in the Alabama Constitution . . . impede their ability and the ability of their elected representatives to raise state and local revenues adequately to fund . . . public education."  Complaint at ¶ 7.  The State argues, however, that this injury does not "affect the plaintiff[s] in a personal and individual way," as required by Article III.  *See* Appellees' Br. at 19 (quoting *Lujan*, 504 U.S. at 560 n.1).

We conclude, contrary to the State's position, that impediments to public education funding arising from racially discriminatory state laws can constitute particularized and concrete injury for purposes of standing.  *See, e.g.*, *Petrella v. Brownback*, 697 F.3d 1285, 1293 (10th Cir. 2012) (holding that alleged intentional underfunding of a school district constituted an injury in fact for purposes of Article III standing).  Under Supreme Court and Eleventh Circuit precedent, discriminatory governmental action of the type alleged here constitutes an Article III injury.  *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (noting that discriminatory government action resulting in noneconomic injury to the plaintiff can support standing); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) ("For purposes of standing, a denial of equal treatment is an actual injury even when the complainant is able to overcome the challenged barrier[.]").  *Cf. United States v. Hays*, 515 U.S. 737, 744-45 (1995) (upholding standing for a plaintiff who resided in a district allegedly created through racial gerrymandering);

*Allen v. Wright*, 468 U.S. 737, 756 (1984) (recognizing the "diminished ability to receive an education in a racially integrated school" as a judicially cognizable injury).

## B

A more difficult question is whether this alleged injury is redressable through the relief sought. The Supreme Court has described redressability as "a substantial likelihood that the relief requested will redress the injury claimed." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 75 n.20 (1978) (internal quotation marks omitted). Redressability is admittedly one of the more amorphous requirements of modern standing doctrine. *See* Gene R. Nichol, Jr., *Rethinking Standing*, 72 CAL. L. REV. 68, 72 n.27 (1984) (noting fluctuations and inconsistencies in the application of the redressability requirement). Nonetheless, it remains part of the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560, and this case can only proceed if the plaintiffs have shown that the requested injunctive relief would likely resolve their inability to adequately raise revenue for public education. *See Warth v. Seldin*, 422 U.S. 490, 504 (1975). *See also Allen*, 468 U.S. at 753 n.19 (explaining that redressibility "examines the causal connection between the alleged injury and the judicial relief requested").

As noted earlier, the plaintiffs seek to invalidate several sections of the Alabama Constitution that allegedly inhibit adequate funding of public education.

These sections can be classified into two types: millage caps (which limit the tax rate) and property classifications (which determine the property valuation rate used to calculate the amount of tax due). Because standing cannot be "dispensed in gross," *see Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008), we address standing for each category of claims separately. *See also Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs.*, 528 U.S. 167, 185 (2000) ("[P]laintiff[s] must demonstrate standing separately for each form of relief sought.").

**1**

Sections 214, 215, and 216 of Article XI of the Alabama Constitution set millage caps that limit the tax rate various government entities may impose on property.[2] Alabama's tax rate is expressed in "mills," with one mill representing $1.00 of tax per $1,000 of assessed property value. Section 214 limits the State's rate of *ad valorem* taxation to 6.5 mills; Section 215 limits a county's rate to 5 mills; and Section 216 limits a municipality's rate to 5 mills. Section 269 of Article XIV limits the rate that counties can levy in *ad valorem* taxes to support

---

[2] Section 214 provides that "[t]he legislature shall not have the power to levy in any one year a greater rate of taxation than sixty-five one-hundredths of one per centum on the value of the taxable property within this state." ALA. CONST. Art. XI, § 214. Section 215 states, in relevant part, that "[n]o county in this state shall be authorized to levy a greater rate of taxation in any one year on the value of the taxable property therein than one-half of one per centum." ALA. CONST. Art. XI, § 215. Under Section 216, "[n]o city, town, village, or other municipal corporation . . . shall levy or collect a higher rate of taxation in any one year on the property situated therein than one-half of one per centum of the value of such property as assessed for state taxation during the preceding year." ALA. CONST. Art. XI, § 216.

9

education and further requires a referendum to approve such a tax.[3]  Significantly,

millage rate increases require legislative and voter approval.  *See* ALA. CONST. Art.

XI, § 217(f).    *See also* Bruce P. Ely & Howard P. Walthall, Sr., *State

Constitutional Limitations on Taxing and Spending: A Comparison of the Alabama

Constitution of 1901 to Its Counterparts*, 33 CUMB. L. REV. 463, 490 (2002-2003)

("Even though Amendment 373(f) attempted to provide a mechanism by which the

people of a county or other taxing authority could decide to increase their tax rates

without amending the Constitution, that provision still requires that they first take

the question to the Legislature for approval.").

"Relief that does not remedy the injury suffered cannot bootstrap a plaintiff

into federal court[.]"  *Steel Co.*, 523 U.S. at 107.  We conclude that removal of the

millage caps found in Sections 214, 215, and 216 of Article XI and Section 269 of

Article XIV—the remedy the plaintiffs seek—will not redress the asserted injury,

which at bottom is the inability of the plaintiffs and their elected officials to raise

state and local revenue for public education.  As we previously noted in *Knight*,

"[i]t is not at all clear that the removal of Alabama's constitutional restrictions on

---

[3] Section 269 provides, in relevant part, as follows: "The several counties in this state shall have power to levy and collect a special tax not exceeding ten cents on each one hundred dollars of taxable property in such counties, for the support and furtherance of education in such manner as may be authorized by the legislature; provided, that the rate of such tax, the time it is to continue, and the purpose thereof, shall have been first submitted to a vote of the qualified electors of the county, and voted for by three-fifths of those voting at such election[.]"  ALA. CONST. Art. XIV, § 269.

10

property tax rates will necessarily result in either *increased tax rates or increased tax revenues*."  *Knight*, 476 F.3d at 1227.

First, it is undisputed that further legislation is necessary to achieve higher millage rates, and "the contingency of [legislative] action makes the redress of plaintiffs' injury . . . speculative."  *Medina v. Clinton*, 86 F.3d 155, 158 (9th Cir. 1996) (internal quotation marks omitted).  The Alabama Legislature (and the people of Alabama) may choose to raise millage rates absent the caps, just as they may choose to maintain the status quo or lower the rates, and we can only guess as to whether removal of the current millage caps will redress the plaintiffs' injury. *See Lujan*, 504 U.S. at 561 ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'").  *See also Clapper v. Amnesty Int'l U.S.A.*, 133 S. Ct. 1138, 1150 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.").

Second, the record indicates that Alabama voters in Lawrence and Sumter Counties, where the plaintiffs reside, have rejected various proposals to increase property taxes.  *See* D.E. 242-1 at ¶ 38 (d), (f).  As the district court noted, "Alabama has authorized all local school systems to levy up to an aggregate of 15.0 mills in *ad valorem* property taxes for educational purposes, in a combination of county and school tax district taxes."  D.E. 296 at 160.  Yet Lawrence and

Sumter Counties are both below the maximum permissible rate. Lawrence County levies property taxes at 10 mills, and Sumter County levies them at 13.8 mills. *See id.* at 167. Given that neither municipality has levied the maximum generally authorized taxes for education, we conclude that an injunction prohibiting enforcement of the millage caps will not likely redress the plaintiffs' injury.

We note, as well, the acknowledgment of plaintiffs' counsel at oral argument that removal of the constitutional millage caps "may or may not" result in higher millage rates. This uncertainty reinforces our conclusion that granting the plaintiffs the relief they request would result in nothing more than a mere "moral" victory, something the federal courts may not properly provide. *See Steel Co.*, 523 U.S. at 107 ("[A]lthough a suitor may derive great comfort and joy from the fact that . . . a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury.").

The plaintiffs attempted to overcome the redressability conundrum at oral argument by labeling their requested relief more simply as the elimination of historical barriers, rather than an affirmative attempt to increase millage rates. This characterization, however, is ultimately unavailing. Under current standing doctrine, we must consider the requested relief in the context of the injury that it purports to redress. The plaintiffs' injury is not simply the existence of the alleged

12

barriers, but the resulting impact of those barriers on the ability to adequately fund education in Alabama's so-called Black Belt. *Cf. Arizona Christian Sch. v. Winn*, 131 S. Ct. 1436, 1448 (2011) ("And while an injunction against application of the tax credit most likely would reduce contributions to [school tuition organizations], that remedy would not affect noncontributing taxpayers or their tax payments. As a result, any injury suffered by respondents would not be remedied by an injunction limiting the tax credit's operation."). That the barriers were allegedly put in place for a discriminatory purpose is not sufficient, in and of itself, to confer standing. *See Allen*, 468 U.S. at 754 ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."). As we have explained, removal of the millage caps is not likely to result in an increased ability to fund public education. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) ("[F]or a federal court to have authority under the Constitution to settle a dispute, the party before it must seek a remedy for a personal and tangible harm.").

**2**

Amendments 325 and 373 to Section 217 of Article XI, however, are another matter entirely. These Amendments establish a property classification system for determining the value of the property that is subject to a given tax rate. *See Howell v. Malone*, 388 So. 2d 908, 913 (Ala. 1980) (noting that Amendment

13

325 "change[d] the uniformity and equality among taxpayers to provide for three classes of property and to establish three different ratios of taxation for the three separate classes," and summarizing the subsequent property classification scheme imposed under Amendment 373). Under these provisions, certain classes of property are assessed only at a percentage of their total value. Class III property, which includes agricultural, forest, and single-family residential property, is taxed at the lowest possible rate: 10% of its value. Class III property owners also may have their property assessed at "current use" value rather than fair market value. As amended, therefore, Section 217 "severely limit[s] the value of property subject to the millage rates." Susan Pace Hamill, *Constitutional Reform in Alabama: A Necessary Step Towards Achieving a Fair and Efficient Tax Structure*, 33 CUMB. L. REV. 437, 445 (2002-2003). And because property is assessed at only a percentage of its actual value, "very little of the property's true fair market value [is] subject to taxation." *Id.* at 443.

As the district court noted, it was "undisputed that the immediate effect of granting the declaratory judgment and injunction plaintiffs seek [with respect to Section 217] w[ould] be to increase property taxes in the State of Alabama." D.E. 35 at 31 (footnote omitted). *See also* D.E. 296 at 112. If the assessment ratios established by Section 217 did not exist, the record indicates that the property in question would be assessed at 100% of its value, rather than at the 10% to 30%

14

currently allowed. *See* D.E. 296 at 112 n.242. And that scenario, as the district court found, of course would necessarily result in more tax revenue for Alabama, at least some of which could be used to fund public education. *Id.* at 111, 113.[4] We therefore conclude that removing the assessment ratios would likely redress (at least in part) the plaintiffs' injury, and that is enough for standing purposes. *See Made in the USA Foundation v. United States*, 242 F.3d 1300, 1310-11 (11th Cir. 2001) (relief which remedies at least some of the alleged injuries is sufficient to establish redressability).

Because we conclude that the plaintiffs lack standing to challenge the millage cap provisions (Sections 214, 215, and 216 of Article XI and Section 269 of Article XIV), the remainder of our discussion focuses solely on Amendments 325 and 373 to Section 217.

### III

Alabama argues that the Tax Injunction Act, 28 U.S.C. § 1341, deprived the district court of jurisdiction over this case. It also contends that principles of comity preclude the exercise of federal court jurisdiction. We begin with the Tax Injunction Act, and then turn to comity.

---

[4] There is some suggestion in the record that invalidating the assessment ratios would not lead to property being assessed at 100%, but instead would result in a 60% assessment ratio for all property. *See* D.E. 31 at 18 (citing *Weissinger v. Boswell*, 330 F. Supp. 615, 619 n.9, 625 (M.D. Ala. 1971)). In any event, the result would be increased tax revenue, which could at least partially redress the plaintiffs' injury.

15

**A**

The Tax Injunction Act is a "jurisdictional rule" and constitutes a "broad jurisdictional barrier." *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 470 (1976). We review the district court's interpretation of the Act *de novo*, and its factual findings regarding jurisdiction for clear error. *See Amos v. Glynn Cnty. Bd. of Tax Assessors*, 347 F.3d 1249, 1255 (11th Cir. 2003).

Although the Act is brief and to the point—it states that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State"—its scope is somewhat unsettled. Guided by a relatively recent Supreme Court decision, *Hibbs v. Winn*, 542 U.S. 88 (2004), we agree with the district court that the Act does not bar this action.

In *Hibbs*, the Supreme Court distinguished between "taxpayer claims that would reduce state revenues and third-party claims that would enlarge state receipts." *Id*. at 108. The latter category of claims, the Court held, does not implicate the Tax Injunction Act because such claims do not "seek to impede [a state's] receipt of tax revenues." *Id.* at 93. As the Court explained, the Act was not intended to "insulate state tax laws from constitutional challenge in lower federal courts even when the suit would have no negative impact on tax

16

collection." *Id.* at 94.

As we read it, *Hibbs* at the very least stands for the proposition that third-party challenges to the validity of state taxing schemes fall outside the ambit of the Tax Injunction Act if the challenges, were they to prove successful, would result in the increase of the tax liabilities of others (and therefore an increase in tax revenues to the state). *Compare id.* at 104 ("Third-party suits not seeking to stop the collection (or contest the validity) of a tax *imposed on plaintiffs* . . . were outside Congress' purview."), *with id.* at 106 (Act bars jurisdiction if federal court relief would "operate[ ] . . . to reduce the flow of state tax revenue"). This is essentially how the Fifth, Seventh, Eighth, Ninth, and Tenth Circuits have read *Hibbs*. *See Henderson v. Stolver*, 407 F.3d 351, 359 (5th Cir. 2005); *Johnson v. Orr*, 551 F.3d 564, 571 (7th Cir. 2008); *City of Jefferson City v. Cingular Wireless, LLC*, 531 F.3d 595, 603-04 (8th Cir. 2008); *May Trucking Co. v. Oregon Dept. of Transp.*, 388 F.3d 1261, 1267 (9th Cir. 2004); *Hill v. Kemp*, 478 F.3d 1236, 1249 & n.12 (10th Cir. 2007).

This appeal presents us with our first opportunity to apply *Hibbs* in a published decision. The district court concluded, based on *Hibbs*, that the Tax Injunction Act did not divest it of jurisdiction because "[t]he undisputed, direct effect of the requested injunction would be to increase property tax revenue." D.E. 296 at 113. In reaching this conclusion, the district court relied in part on

17

Alabama's own concession that the requested injunction would lead to significant increases in property taxes, potentially as high as 1,000%. *See* D.E. 296 at 113 & n. 238.[5]

On appeal, the State has changed its jurisdictional tune, and now argues that "prohibiting enforcement of [its] property-valuation scheme (Amendments 325 and 373 and their implementing statutes and regulations) could take a . . . detrimental toll on public revenue collections" because "tax officials in all jurisdictions may well be powerless to issue property valuations," and "without valid property valuations, they would be powerless to collect any property tax at all." Appellees' Br. at 24-25. Alabama's newly-minted factual maybes, however, do not require reversal of the district court's jurisdictional ruling as to the Tax Injunction Act.

As an initial matter, whether tax revenues would rise or fall if the plaintiffs succeed on their challenges to Amendments 325 and 373 is a matter that is at least partly factual in nature, and we as an appellate tribunal are not in the business of fact-finding. Although we recognize that we have an obligation to address subject-matter jurisdiction questions even when raised for the first time on appeal,

---

[5] The State's concession in the district court read as follows: "If Plaintiffs are successful in challenging the restrictions on assessment ratios in Amendment 373 to the Alabama Constitution, and an injunction is issued, property in every classification would automatically be assessed at 100%, as opposed to the 10%, 20%, and 30% current ratios for residential, commercial, and utility property, respectively. . . . By way of example, Alabama taxpayers with a $100,000 home in a county with a property tax rate of 50 mills would see their annual property tax bill increase from $300 to $3,000, after taking into account the homestead exemption and the change in assessment ratio." D.E. 27 at 2 n.1. *See also id.* at 26 ("[I]t is certainly plausible that tax revenues would increase . . . .").

18

Alabama offers us no reason why we should second-guess the district court's findings as to jurisdictional facts. The district court and the plaintiffs alike were entitled to rely on Alabama's factual concession that taxes would rise if the court enjoined enforcement of Amendment 373 and to believe, given that concession, that no further evidence on the issue was needed. "Consent of parties cannot give the courts of the United States jurisdiction, but the parties may admit the existence of facts which show jurisdiction, and the courts may act judicially upon such an admission." *Ry. Co. v. Ramsey*, 89 U.S. 322, 327 (1874). *See also Estate of Amergi ex rel. Amergi v. Palestinian Authority*, 611 F.3d 1350, 1359 (11th Cir. 2010) ("litigants are sometimes held to concessions or admissions of fact they make before a district court") (collecting cases). In short, the State told the district court that taxes would increase if the plaintiffs prevailed, and it has offered no valid reason why it should be allowed to backtrack on this factual concession now.[6]

In any event, we cannot say on this record that the district court's factual finding as to the impact of the plaintiffs' action on state revenues was clearly

---

[6] We remind counsel that, as officers of the court, they have a duty to raise alleged defects in subject-matter jurisdiction when they first become apparent, not merely when doing so becomes strategically expedient. *See Aves ex rel. Aves v. Shah*, 997 F.2d 762, 767 (10th Cir. 1993) ("[W]hile subject matter jurisdiction enjoys a special status . . . as an officer of the court, candor and honesty are not only expected, they are demanded. The 'tactic' of [stipulating to subject-matter jurisdiction at the district court], while planning to challenge jurisdiction if an appeal becomes necessary, will not be tolerated.").

erroneous.  The State's new position that tax revenues *might* decrease is not based on any record evidence.  Rather, the argument hinges on Alabama's unsupported assumption that Section 217 is the source of the State's authority to issue property valuations.  Based solely on a concurring opinion in a decision of the Alabama Supreme Court, *see Ex Parte James*, 836 So. 2d 813, 830 (Ala. 2002) (Houston, J., concurring) ("[T]he rule of automatic revival of predecessor statutes is not similarly applicable to the revival of constitutional provisions."), Alabama asserts that invalidation of Section 217 would render "all jurisdictions . . . powerless to issue property valuations."  Appellees' Br. at 25.  But that concurring opinion is too slender a reed on which to conclusively predict what would happen under the Alabama Constitution were the assessment ratios to be invalidated.

Indeed, Alabama points to no language in the challenged Amendments and to no case law suggesting that Section 217 is the only source of the State's power to issue valid property valuations.  To the contrary, under Alabama law, "taxing power . . . has always been inherent in the State, and vested in the legislative branch of State government," subject only to the limitations found in the State Constitution.  *See W. S. Brewbaker, Inc. v. City of Montgomery*, 119 So. 2d 887, 891 (Ala. 1959) (internal quotation marks omitted).  Because the State's power to tax is plenary, we see no reason to treat Section 217 as conferring power on the State to issue property valuations.  *See id.* (holding that Section 216 is not a grant

20

of the power to levy taxes, but instead is a limit on the State's inherent taxing power).  In sum, we find no support (and certainly no conclusive support) for the State's argument that enjoining enforcement of Amendments 325 and 373 would "halt[ ] all property tax collections" in Alabama by stripping all jurisdictions of the power necessary to issue valid property valuations.  *Cf. Duke Power Co.*, 438 U.S. at 78 ("Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate . . . speculative or hypothetical possibilities.") (discussing Article III standing).  The plaintiffs' challenges to Amendments 325 and 373 to Section 217 are not barred by the Tax Injunction Act.

Nothing in the Supreme Court's opinion in *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010), undermines this conclusion.  To the extent *Levin* opines on the scope of the Tax Injunction Act at all, it does so only in dicta.  *See id.* at 432 ("Because we conclude that the comity doctrine justifies dismissal of respondents' federal-court action, we need not decide whether the TIA would itself block the suit.").  And that dicta, in any event, supports our holding that the Act does not bar the plaintiffs' challenges to Section 217.  As the Supreme Court explained in *Levin*, "*Hibbs* held that the TIA d[oes] not preclude a federal challenge by a third party who object[s] to a tax credit received by others, but in no way object[s] to her own liability under any revenue-raising tax provision."  *Id.* at 430.  That is precisely the case here.

21

**B**

In the district court and in its brief on appeal, Alabama raised comity as a threshold defense.  Relying on *Levin*, 560 U.S. at 429-32, it asserted that comity "bar[s] federal-court interference in 'every case' concerning state 'fiscal operations' where state courts offer an adequate forum for vindicating the 'asserted federal right.'"  Appellees' Br. at 27 (quoting *Matthews v. Rodgers*, 284 U.S. 521, 525 (1932)).

We need not express any view on Alabama's comity argument.  During oral argument, counsel for the State told us the following: "[E]ven if the court is persuaded by comity, we would especially ask [you], in light of the expense the State has gone to, to reach the merits and affirm."  Upon further questioning by the panel, counsel indicated that Alabama preferred not to prevail on comity grounds alone because such a ruling would presumably invite (or at least permit) state-court litigation of the same issues.  We construe these statements by counsel as a request by Alabama to abandon its comity argument on appeal.  Because comity is not jurisdictional in nature, *see Levin*, 560 U.S. at 433-34 (Thomas, J., concurring), the State is free to withdraw the comity argument, and we grant its request to do so. *Cf. Cosby v. Jones*, 682 F.2d 1373, 1376 n.6 (11th Cir. 1982) ("Because the basis of exhaustion is comity and not jurisdiction, exhaustion of state remedies may be waived by the state.") (citation omitted).

22

## IV

We finally turn to the merits of the challenges to Amendments 325 and 373 to Section 217, the only claims that are justiciable.  As an initial matter, we deem it unnecessary to independently review the constitutionality of Amendment 325, which established Alabama's property classification system for taxation in 1972. *See* Hamill, *Constitutional Reform in Alabama*, 33 CUMB. L. REV. at 442 n.16. Amendment 325 was superseded in 1978 by Amendment 373, *see State v. Colonial Pipeline Co.*, 471 So. 2d 408, 410 (Ala. Civ. App. 1984), and is no longer operative.  The plaintiffs presumably challenged both Amendments because of the possibility that invalidation of Amendment 373 would revive Amendment 325 under Alabama law.  *Cf. Deputy Sheriffs Law Enforcement Assoc. v. Mobile Cnty.*, 590 So. 2d 239, 242-43 (Ala. 1991) (noting that Alabama law recognizes the principle of revival of predecessor statutes wherein "the very act of declaring a statute unconstitutional brings the predecessor statute . . . back into full force"). Because we affirm the district court's ruling on the constitutionality of Amendment 373, however, there is no possibility that the principle of revival will come into play.

To prevail on their constitutional challenge to Amendment 373, the plaintiffs were required to prove not only discriminatory impact, but also racially discriminatory intent or purpose.  *See Hunter*, 471 U.S. at 227-28; *Vill. of*

23

*Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)).[7] "Discriminatory intent" means that "racial discrimination [was] a substantial or motivating factor behind enactment of the law." *Hunter*, 417 U.S. at 228 (internal quotation marks omitted). A district court's finding as to discriminatory intent is a factual one that cannot be set aside unless it "is clearly erroneous, is based on clearly erroneous subsidiary findings of fact, or is based on an erroneous view of the law." *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005) (citation and internal quotation marks omitted). For the reasons that follow, we discern no clear error in the district court's finding that Amendment 373 was not racially motivated.

The Supreme Court has observed that "[p]roving the motivation behind official action is often a difficult undertaking." *Hunter*, 471 U.S. at 228. It has, however, set forth "subjects of proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268. These include the racial "impact of the official action," the "historical background of the decision," the "specific sequence of events" leading to the decision, procedural or substantive "departures from the normal" sequence, and "legislative or

---

[7] We, like the district court, decline the plaintiffs' invitation to apply the burden-shifting framework set forth in *United States v. Fordice*, 505 U.S. 717 (1992), as "[t]he segregative policies proscribed by *Fordice* govern higher education, not revenue raising." *Knight*, 476 F.3d at 1226 (concluding that *Fordice* did not apply to an attack on "Alabama's tax policies [which allegedly] seriously limit[ed] the ability of both the State and its counties to raise revenue from property taxes and, therefore, fund its K-12 schools").

administrative history." *Id.* at 266-68.  The district court correctly identified and applied these factors in determining whether racially discriminatory intent existed. *See* D.E. 296-1 at 421-25.[8]

The plaintiffs contend that the district court committed legal error by impermissibly discounting the probative value of the historical context surrounding the enactment of the challenged Amendments.  They point to, among other things, Alabama's long-lived hostility to the use of property taxes for funding public education of black children.  They note that the enactment of these Amendments was embedded in, and indeed a continuation of, Governor George C. Wallace's "popular campaign of massive resistance to school desegregation."  Appellants' Br. at 54.  And they emphasize that Alabama chose to entrench its historically low property assessments into the Constitution—after two special sessions of the Legislature—at the "same time that nearly all whites in the Black Belt were fleeing the public schools, leaving behind underfunded public school systems that were almost entirely black."  *Id.* at 54-55.  *See also id.* at 60 ("Governor Wallace told private school patrons in Bibb County: 'I think it's a horrible thing that you people have to pay taxes to support *public schools*.  Then you have to dig in again to pay for *quality education* for your children *in a private school*.'").

Any suggestion that the district court ignored or improperly discounted this

---

[8] We do not read the district court's opinion, as the plaintiffs do, to require either proof of personal racial animus or "smoking gun" evidence.

evidence is belied by its exceptionally thorough discussion of Alabama's long history of racial discrimination. Although the district court acknowledged that Alabama's "racist past . . . cast long shadows," it ultimately found that Amendments 325 and 373 were financially, and not discriminatorily, motivated. *See* D.E. 296-1 at 776. After weighing the evidence, the district court was persuaded that the Amendments "were a reaction to the increases in property appraisals and assessments mandated by the *Weissinger* decision, and the accompanying threat of a tremendous increase in the property taxes paid by large landowners." *See id.* at 771.[9] Evidence in the record supports this finding, including evidence of massive resistance to substantial property tax increases, *see id.* at 664, 769; heavy support from the Alabama Farm Bureau Federation, a "powerful lobbying organization," *see id.* at 642, 768; D.E. 242-1 at ¶ 186; and a clash between rural and urban interests, *see* D.E. 242-1 at ¶ 191, 194. *See also* D.E. 296-1 at 679-80 (noting that Amendment 325, on its own, had been insufficient to "protect rural interests").

"[A] trial court's choice between 'two permissible views of the evidence' is the very essence of the clear error standard of review." *United States v. Rodriguez De Varon*, 175 F.3d 930, 945 (11th Cir. 1999) (en banc) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564 (1985)). Even if we were inclined to reach a

---

[9] In *Weissinger*, decided in 1971, a district court mandated that Alabama equalize property assessments statewide. *See* 330 F. Supp. at 625.

different conclusion as the triers of fact, the district court did not clearly err by choosing to credit the evidence indicating that race was not a "substantial or motivating" factor behind the property classification system.

The Supreme Court's decision in *Hunter* does not mandate a different result. There, the Court held that the district court's finding of no discriminatory intent in the adoption of Section 182 of the Alabama Constitution was clearly erroneous based on the overwhelming evidence of racial animus surrounding the Constitutional Convention of 1901. *See Hunter*, 471 U.S. at 225. The record not only revealed that the Constitutional Convention was convened with the express intent of "establish[ing] white supremacy in [the] State," but also demonstrated that Section 182 was itself enacted with the specific intent of disenfranchising black voters. *See id.* at 229, 232 (noting that "the suffrage committee selected crimes [that would disqualify persons from registering and voting] . . . that were thought to be more commonly committed by blacks"). We by no means intend to suggest that *Hunter* establishes a threshold that must be met in order to establish discriminatory intent; *Hunter*, to the contrary, was an anomalous case in that the record was replete with direct and overwhelming evidence of racial discrimination. Although *Hunter* does not set the floor for an evidentiary showing of discriminatory intent, neither does it compel a conclusion that the district court clearly erred. Simply stated, the evidence in *Hunter* was quantitatively and

27

qualitatively different than the evidence here.[10]

<h1 style="text-align:center">V</h1>

In deciding this difficult appeal, we are cognizant of Alabama's deep and troubled history of racial discrimination, and given the evidence at trial, we share in the district court's concern regarding Alabama's public education system:

> Alabama continues to be plagued by an inadequately funded public school system — one that hinders the upward mobility of her citizens, black and white alike, especially in rural counties. . . .  [As a result,] [t]he children of the rural poor, whether black or white, are left to struggle as best as they can in underfunded, dilapidated schools.

D.E. 296-1 at 797-98.  Courts, however, are not always able to provide relief, no matter how noble the cause.

Here, because the requested remedy would not redress the alleged injury, the plaintiffs lack standing to challenge the constitutional millage cap provisions despite the district court's finding that they were enacted with discriminatory intent.  The plaintiffs' challenges to these provisions are therefore dismissed without prejudice.  The plaintiffs' challenges to the State's property classification

---

[10] In light of our ruling, we need not address the district court's findings with respect to discriminatory impact.  As we have noted, the plaintiffs could not succeed without proving discriminatory intent, even if discriminatory impact existed.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 264-65 ("Official action will not be held unconstitutional solely because it results in a racially disproportionate impact.").  In addition, because we conclude that the district court did not clearly err in its findings on the Fourteenth Amendment claims, we affirm without further discussion the district court's rejection of the plaintiffs' claim under Title VI, 42 U.S.C. § 2000d et seq.  *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (concluding that Title VI claim "also fail[ed]" because "the Equal Protection Clause [did] not prohibit the Law School's narrowly tailored use of race in admissions decisions").

system (as set forth in Amendments 325 and 373 to Section 217) are not similarly barred, yet these claims fail because we cannot say that the district court clearly erred in finding that this system was not the product of invidious discriminatory intent. Although the evidence presented could have supported a finding of discriminatory intent, sufficient evidence also rendered permissible the district court's finding that these Amendments were financially, and not discriminatorily, motivated. Under clear-error review, we are not free to second-guess the district court's choice between two permissible views of the evidence. Accordingly, we affirm in part as to the claims related to Amendments 325 and 373 to Section 217, and vacate and remand in part with instructions to dismiss, without prejudice, the claims related to Sections 214, 215, and 216 of Article XI and Section 269 of Article XIV.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS TO DISMISS IN PART.**